UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

ANNE WHITE HAT, RAMON MEJÍA,
KAREN SAVAGE, SHARON LAVIGNE, HARRY
JOSEPH, KATHERINE AASLESTAD, PETER
AASLESTAD, THEDA LARSON WRIGHT,
ALBERTA LARSON STEVENS, JUDITH
LARSON HERNANDEZ, RISE ST. JAMES, 350
NEW ORLEANS, and LOUISIANA BUCKET
BRIGADE,

CIVIL ACTION NO.

JUDGE

MAGISTRATE JUDGE

  *Plaintiffs,*

  vs.

JEFF LANDRY, in his official capacity as
Attorney General of Louisiana; BO DUHÉ, in
his official capacity as District Attorney of the
16th Judicial District Attorney's Office;
RONALD J. THERIOT, in his official
capacity as Sheriff of St. Martin Parish,

  *Defendants*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NOW INTO COURT, through undersigned counsel, come the above-named Plaintiffs

who, pursuant to 42 U.S.C. §§ 1983 and 1988, bring this facial and as-applied challenge to the

2018 amendment to La. R.S. 14:61, the law prohibiting unauthorized entry of a critical

infrastructure, and allege the following:

### INTRODUCTION

1.  In 2018, the Louisiana Mid-Continent Oil and Gas Association (LMOGA) drafted and

proposed an amendment to Louisiana's Critical Infrastructure law, which was passed by the

legislature, that is so vague, overly broad, and sweeping in scope that people in the state cannot

be sure of where in the vicinity of Louisiana's vast 125,000-mile network of pipelines they can

legally be present, who decides where they can be present, or what conduct is prohibited that can subject them to up to five years in prison, with or without hard labor. And, as more than a dozen arrests of peaceful protesters under the new law demonstrate, its actual aim is to chill, and harshly punish, speech and expression in opposition to pipeline projects LMOGA promotes.

2.    The amended statute, La. R.S. 14:61, is unconstitutional on its face and as applied because: 1) it is vague as it does not provide adequate notice to plaintiffs and others, as well as state actors who must enforce the law, what conduct is prohibited and where, and allows for arbitrary and discriminatory enforcement; 2) it is overbroad and has the effect of chilling constitutionally protected speech or expression; and 3) targets speech and expressive conduct with a particular viewpoint for harsher punishment.

3.    Before August 1, 2018, La. R.S. 14:61 prohibited unauthorized entry of critical infrastructure which was comprised of facilities like refineries, chemical manufacturing facilities, and water treatment plants which occupy visible and discrete land areas often completely enclosed by physical barriers and/or clearly demarcated by signs. The law gave notice to those who would enter such facilities without authorization, or remain after being forbidden, that they were on specially designated and protected property.

4.    As of August 1, 2018, the definition of critical infrastructure includes the vast network of 125,000 miles of pipelines running through Louisiana, the overwhelming majority of which is not visible or clearly marked.

5.    Landowners with pipelines running through their properties, pedestrians walking along public roads, sidewalks, or other public spaces that may have pipelines running underneath, recreational boaters and commercial vessels in waters through which pipelines may run, now cannot be sure of where they can lawfully remain present, what conduct is prohibited, when,

where, or why it is prohibited, or even who determines whether it is prohibited and how. Yet

they face a sentence of up to five years in prison, with or without hard labor, for being on or near

a type of critical infrastructure which could be completely invisible and virtually anywhere.



Source: Louisiana Department of Natural Resources

    6.   On its face, the law as amended to include pipelines is vague and thus constitutionally

defective. As applied, the law's vagueness, overbreadth, and unconstitutional aim are glaringly

apparent in the felony arrests of pipeline opponents engaged in non-violent protest immediately

after the law went into effect.

7.  Before August 1, 2018, those who engaged in peaceful demonstrations or civil disobedience in the vicinity of pipelines or pipeline construction sites faced the possibility of a misdemeanor charge of trespass if they remained on the property after being forbidden. As of August 1, 2018, they now face felony charges carrying the possibility of up to five years imprisonment, with or without hard labor, and up to $1,000.00 in fines.

8.  At the time the legislation was introduced by LMOGA, construction had begun on the Bayou Bridge Pipeline (BBP), a highly controversial pipeline that would be connected to the same network of pipelines linking the also-controversial Dakota Access Pipeline (DAPL). The Bayou Bridge Pipeline runs 162.5 miles from Lake Charles to St. James, through 700 bodies of water, including the Atchafalaya Basin and Bayou LaFourche, the source of drinking water for the United Houma Nation and other surrounding communities.

9.  The Bayou Bridge Pipeline was being fought by opponents in federal and state courts, including people living in communities that would be impacted by the pipeline, such as St. James, a predominately African-American community where the pipeline would pump an additional 500,000 barrels of oil a day into a district already overrun and polluted by petrochemical facilities. The pipeline was also opposed by indigenous leaders and environmental justice activists raising concerns about leaks and spill records of the companies involved in the project, and the role of pipelines in exacerbating coastal land loss in Louisiana. Crawfishers who depend on access to clean waterways and wetlands for their business and survival, and landowners whose property was targeted by the company for expropriation were also opposing the pipeline.

10. On August 9, 2018, days after the law went into effect, the first criminal charges were levelled against Water Protectors – demonstrators non-violently protesting the Bayou Bridge

pipeline from kayaks in a navigable waterway. More arrests and felony charges under the newly amended law followed over the next several weeks. Those arrested included demonstrators canoeing in navigable waters, observing and sitting in trees, as well as a journalist covering the events.

11. As of the date of this filing, there have been more than a dozen arrests of people peacefully protesting and a journalist covering the events who were charged with felonies for acts which would have been charged as misdemeanor trespass before August 1, 2018 – and only if in fact those arrested did not have permission or a legal right to remain on the property in the first place. They now face the possibility of prosecution and, if found guilty, up to five years in prison and heavy fines.

12. Many of these arrests were on property where the pipeline company itself was trespassing and did not have a legal right of way or easement, and the protesters had the permission of co-owners of the property to be present. In fact, a Louisiana state court issued a ruling after a trial in November 2018 that BBP was guilty of trespass on the very property where it had directed its agents to apprehend, detain, handcuff, and arrest peaceful protestors

13. The Louisiana law emerged as part of a national trend of similar legislation pursued by oil and gas interests aimed at cracking down on and chilling protests against fossil fuel infrastructure projects, which are taking place as part of an important national debate about the worsening environment and climate crisis. It is therefore no accident that the law was invoked immediately after its passage by a private security company working in tandem with local law enforcement at the behest of a private oil pipeline company.

## NATURE OF THE ACTION

14. It is among the most basic, fundamental principles in American jurisprudence that a statute violates due process when its prohibitions are vague and not clearly defined because "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. N.J.,* 306 U.S. 451, 453 (1939). A law is also void for vagueness when it lacks explicit standards to guide those enforcing the law and can lead to arbitrary and discriminatory enforcement. *Smith v. Goguen,* 415 U.S. 566, 574 (1974). *See also, FCC v. Fox Television Stations, Inc.* 567 U.S. 239, 253-54 (2012) ("precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way"). Moreover, "[w]hen speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.*

15.    The amended statute is unconstitutional because it is void for vagueness, overbroad, targets speech and expressive conduct, and singles out a particular viewpoint for harsher punishment. Plaintiffs are entitled to (i) declaratory relief under Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201 declaring La. R.S. 14:61 as amended unconstitutional under the First and Fourteenth Amendments to the United States Constitution and (ii) injunctive relief under Rule 65 of the Federal Rules of Civil Procedure enjoining the enforcement of La. R.S. 14:61 as amended.

## JURISDICTION

16. Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States.

17. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and jurisdiction to grant the requested declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and Rules

57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of the Court.

18.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to Plaintiffs' claims occurred in this district. Venue is also appropriate under 28 U.S.C. § 1391(b)(1) because at least one Defendant resides in this judicial district.

## PARTIES

*Plaintiffs*

### A.  *Pipeline Opponents and Journalist Arrested and Charged with Felonies Under the New Law: Anne White Hat, Ramon Mejía, and Karen Savage*

19. ANNE WHITE HAT is Sicangu Lakota, originally from Rosebud, South Dakota, who has been a resident of Louisiana for more than nine years. White Hat was part of an indigenous-led opposition to the Bayou Bridge Pipeline in Louisiana. She was arrested on September 18, 2018, after leading a prayer ceremony at a boat launch near St. Martinville, Louisiana, and charged with two felony counts under La. R.S. 14:61 for unauthorized entry of a critical infrastructure that allegedly occurred on September 3, 2018, near a pipeline construction site in the Atchafalaya Basin. White Hat had been present on the property in question as a Water Protector with the permission of co-owners. She engaged in non-violent protest against and monitoring of the pipeline project and was trying to raise awareness about the fact that the pipeline was being constructed on the property illegally, a fact later confirmed as the company was found by a Louisiana court to have been trespassing at the time. White Hat is currently facing the possibility of prosecution for the two felony charges that are subject to a combined 10 years imprisonment. The pending charges have affected her life and her ability to engage in further demonstrations against the Bayou Bridge pipeline and other petrochemical projects.

20. RAMON MEJÍA is an eighth-grade social studies teacher and a founding member of #VetsVsHate, a national grassroots initiative founded by war veterans to overcome racism and bigotry, and resides in Biloxi, Mississippi. Mejía was arrested on August 18, 2018, while engaged in non-violent protests with other Water Protectors against the Bayou Bridge Pipeline in the Atchafalaya Basin on property where he was present with the permission of co-owners, and where the pipeline company was later found by a court to have been trespassing at the time Mejía was arrested. Mejía was charged under La. R.S. 14:61 with unauthorized entry of a critical infrastructure and faces the possibility of prosecution and a sentence of up to five years in prison and a heavy fine.

21. KAREN SAVAGE is an investigative journalist and photojournalist who covers stories on criminal justice and the environment, and a resident of New York, New York. Savage was arrested and charged with unauthorized entry of a critical infrastructure on August 18, 2018, while observing protests of the Bayou Bridge Pipeline on property in the Atchafalaya Basin, where she and protesters had permission of co-owners to be present. Savage was later arrested a second time on September 18, 2018, along with White Hat, for unauthorized entry of a critical infrastructure that allegedly occurred on September 3, 2018, during protests of the construction of the Bayou Bridge Pipeline. Savage was charged under La. R.S. 14:61 with unauthorized entry of a critical infrastructure. She now faces the possibility of prosecution and a combined 10 years imprisonment as well as heavy fines. The law, with its harsh penalties has impacted and chilled her ability to observe and report on events that are of great public concern.

**B. Landowners**

22. SHARON LAVIGNE is a resident of Louisiana, who lives and owns property in the predominately African-American Fifth District of St. James Parish, which is heavily pervaded by

petrochemical facilities, including tank farms, and pipelines. Part of Lavigne's property, which has been in her family for generations, was long subject to an oil, gas, and mineral lease. As a landowner with oil and gas exploration operations and potentially pipelines running through her property, Lavigne is concerned about the vagueness in the amended law as to its reach and scope and who gets to decide when she, her family, or guests can be on or near those parts of the property. Lavigne is also founder and president of RISE St. James, a grassroots, faith-based organization dedicated to opposing the siting of new petrochemical facilities in the area out of concern for the worsening health effects and environmental pollution from industry in the area. In that capacity, she has organized marches, press conferences, and demonstrations, in the area and intends to continue to do so in St. James and elsewhere in the region known as "Cancer Alley," the 85-mile stretch between Baton Rouge and New Orleans heavily burdened by petrochemical facilities. Lavigne is concerned that the law will impact their ability to march and protest in areas where there are numerous pipelines.

23. KATHERINE AASLESTAD, a resident of West Virginia, and her brother PETER AASLESTAD, a resident of Virginia, along with THEDA LARSON WRIGHT, and her sisters, ALBERTA LARSON STEVENS and JUDITH LARSON HERNANDEZ, residents of New Mexico, own undivided interests in the same parcel of land located in the Atchafalaya Basin in St. Martin Parish. Their families have owned an interest in the land for several generations. There are two pipelines running through their property, including the Bayou Bridge Pipeline. They were opposed to the Bayou Bridge project out of concern about the environment and health of communities that would be affected by the pipeline, damage to the Basin, effects on flood control, and coastal land loss in Louisiana, and the increasing threats posed by climate change. They were also distressed and upset by the fact that Bayou Bridge began constructing on their

property without obtaining their consent and even before commencing an expropriation proceeding. They grew even more concerned that people who were protesting the pipeline project on their property were being arrested and charged with felonies under the new law while the company was there illegally and urging the arrests.

24. On July 26, 2018, Peter Aaslestad brought an injunction proceeding to enjoin the company from continuing to trespass on his property without his permission and without an expropriation judgment. While that case was pending, the company continued to illegally enter onto the property and construct its pipeline, and private security forces and law enforcement continued to arrest protesters on the property and charge them with felonies after the new law went into effect. In November 2018, after a trial a Louisiana court found that the company had in fact trespassed.

25. All of the property owners (collectively "Landowners") are concerned that the new law makes it unclear where they can be present on their property and when, and who gets to decide. They are concerned that they and other landowners, and guests they allow onto their property, face the possibility of five years in prison if they run afoul of the law merely by being present on or in the vicinity of the pipeline on their property with no clear direction as to why, when, who decides, and how the law is to be applied.

### C. Community Leaders and Environmental Justice Organizations Opposing Pipeline Projects

26. HARRY JOSEPH is a resident of Louisiana and the 5th District in St. James Parish, a predominately African-American community heavily inundated by petrochemical facilities, including tank farms and numerous pipelines. He is pastor of Mount Triumph Baptist Church and a member of RISE St. James. Joseph has been an active and vocal community leader who speaks out frequently against the siting of new petrochemical companies in the area. Joseph was

very active and outspoken against the Bayou Bridge Pipeline project because it would pump an additional 500,000 barrels a day into his community and encourage even more petrochemical projects to locate in the area to take advantage of the increased oil supply. Joseph has helped organize public events on these issues and has organized and participated in marches and press conferences about the Bayou Bridge Pipeline and other petrochemical projects, and at times attempted to monitor, observe and report on the construction of the Bayou Bridge pipeline. He is concerned that the new law will make it more difficult to organize and participate in marches and events expressing opposition to such projects, given the proliferation of pipelines in the community.

27. RISE St. James is a grassroots, faith-based organization founded to oppose the ongoing siting of polluting industry in St. James, and particularly in the 5th District, a predominately African-American community, pervaded by petrochemical facilities, including tank farms and numerous pipelines, because of concerns about harmful health effects on the community and ongoing environmental pollution. RISE St. James has organized press conferences, revivals, and marches to protest the permitting of new petrochemical facilities in the surrounding area, and intends to continue to do so.  Given that the petrochemical infrastructure, including pipelines, is so pervasive in St. James, and the 5th District in particular, RISE is concerned that the law could be used against them to prevent or discourage their protests and public events held to raise awareness about the dangers of the projects to the communities that will be affected by them.

28. 350 NEW ORLEANS is a volunteer climate activist group, and registered non-profit organization, based in New Orleans that supports local initiatives connecting the issues in the region to international climate advocacy. Local members advocate for climate and environmental justice and frequently exercise their First Amendment rights to advocate, educate about, and

protest environmental injustices in Louisiana, including opposition to pipeline projects. Members have engaged in acts of civil disobedience and have incurred misdemeanor charges when protesting near or on pipeline construction sites. They desire to continue protesting such projects as well as support communities where pipelines are likely present. Their work and political advocacy, however, are directly impacted by the amendment to La. R.S. 14:61 as it severely increases the punishment for presence on or near pipelines and chills their First Amendment expression of these views and deters others from joining their protests and demonstrations.

29. LOUISIANA BUCKET BRIGADE ("Bucket Brigade") is a non-profit environmental health and justice organization based in New Orleans that works with communities in Louisiana located near oil refineries and chemical plants, which are often predominantly African-American communities. It has members who frequently exercise their First Amendment rights to advocate, educate about, and protest against environmental injustices, including pipeline projects. Members and staff of the Bucket Brigade publicly opposed and demonstrated against the Bayou Bridge Pipeline, a controversial and high-profile pipeline project. Bucket Brigade staff also reported live and frequently filmed activities in the area, interviews with experts, community members, and activists, at or near pipeline construction sites and have been at times threatened by pipeline construction workers and/or security personnel. Their work and political advocacy are directly impacted and chilled by the amendment to La. R.S. 14:61 as it severely increases the punishment for presence on or near pipelines and its members are concerned about the possibility of arrests and felony charges.

*Defendants*

30. Defendant Jeff Landry is sued in his official capacity as Attorney General of the State of Louisiana.  Landry is a person within the meaning of 42 U.S.C. § 1983, who, *inter alia,* exercises supervision over all district attorneys in the state and has authority to institute a prosecution as he may deem necessary for the assertion or protection of the rights and interests of the state, pursuant to La.C.Cr.P. Art. 62. As such Landry wields authority over criminal justice policy in Louisiana including the enforcement of La. R.S. 14:61 prohibiting unauthorized entry of critical infrastructure. At all times relevant to this Complaint, Landry was acting and continues to act under color of state law.

31. Defendant Bo Duhé is sued in his official capacity as the District Attorney of the 16th Judicial District in Louisiana where protesters have been arrested and charged with felonies under the 2018 amendment to La. R.S. 14:61. Duhé is a person within the meaning of 42 U.S.C. § 1983, who has "charge of every criminal prosecution by the state in his district," pursuant to Art. V, § 26 of the Louisiana Constitution of 1974. At all times relevant to this Complaint, Landry was acting and continues to act under color of state law.

32. Defendant Ronald J. Theriot is sued in his official capacity as Sheriff of St. Martin Parish where protesters have been arrested, booked, detained, and charged with felonies under the recent amendment to La. R.S. 14:61. Theriot is a person within the meaning of 42 U.S.C. § 1983, who serves as "chief law enforcement officer in the parish," pursuant to Art. V, § 27 of the Louisiana Constitution of 1974, with authority to enforce the recent amendment to La. R.S. 14:61. At all times relevant to this Complaint, Theriot was acting and continues to act under color of state law.

## FACTUAL BACKGROUND

33. Louisiana has approximately 125,000 miles of pipelines running through it, including 87,764 miles onshore and approximately 37,000 miles of pipelines offshore in Louisiana waters. *See* Louisiana Mid-Continent Oil and Gas Association ("LMOGA"),

http://www.lmoga.com/industry-sectors/.

I.   **Environmental Protests Against Controversial Pipelines and the Industry's Legislative Responses.**

34. Environmental organizations and advocates have been opposing pipeline construction to protect the environment and health of the people in Louisiana for years.

35. When thousands of people protested the construction of the DAPL in North Dakota, the petrochemical lobby in Louisiana and other states took notice.

36. In Louisiana, the Bayou Bridge Pipeline project became a high-profile and controversial issue and matter of public concern.  The BBP is a 24-inch, 163-mile long crude oil pipeline starting in Lake Charles and terminating in St. James, Louisiana. It is the southern end of the same network of pipelines that includes the DAPL and the two pipelines share the same parent companies, Energy Transfer Partners, which merged with Sunoco, and Phillips 66.

37. Environmental and climate justice advocates were concerned about the project in light of the companies' history of leaks, spills, and accidents, particularly since the pipeline would cross through 700 bodies of water, including the Atchafalaya Basin, and Bayou LaFourche, which is the source of drinking water for the United Houma Nation and other surrounding communities.

38. Environmental advocates and community leaders in St. James, where the pipeline would end, were concerned about the impacts on that majority African-American community which is already surrounded by petrochemical facilities. Other advocates were concerned about the impacts of pipelines on the Atchafalaya Basin as they have impeded the natural flow of water

and sediment, increasing the likelihood of flooding and contributing to Louisiana's coastal land loss crisis.

39. Advocates in Louisiana began speaking out against and protesting the project as early as 2016 after the company applied for permits. In the first half of 2018 alone, several dozen protestors against the Bayou Bridge pipeline were arrested and charged with misdemeanor trespass.

40. At the same time, opposition to such projects was spreading around the country as thousands of protesters had gathered at Standing Rock in North Dakota to support the indigenous-led opposition to DAPL and other public opposition intensified around similar projects in Nebraska, Pennsylvania, Oklahoma, Iowa, and Texas.

41. In response, legislation that sought to impose felony-level penalties on peaceful protesters through critical infrastructure laws began to emerge in different states.

42. Oklahoma was among the first to pass such legislation and the bill's sponsor acknowledged that he introduced it in response to the DAPL protests. The Oklahoma legislation introduced severe penalties for interfering with pipelines and other "critical infrastructure" and created conspiratorial liability for any organization that conspired in violating the law with steep fines. *See* Nicholas Kusnetz, *How Energy Companies and Allies Are Turning the Law Against Protesters,* Aug. 22, 2018, https://insideclimatenews.org/news/22082018/pipeline-protest-laws-felony-free-speech-arrests-first-amendment-oklahoma-iowa-louisiana.

43. Shortly after the Oklahoma legislation was passed, the American Legislative Exchange Council (ALEC), a corporate-funded membership association of state legislators, adopted model

legislation based on the Oklahoma critical infrastructure law. That model legislation has served as the basis for legislation that has been introduced in approximately 20 states.[1]

44. National industry associations also viewed the Louisiana legislation as part of the broader plan to deal with pipeline protestors. GAIN, which stands for Grow America's Infrastructure Now, is a national coalition of businesses and trade associations that had been engaging in strategic communications and public relations on behalf of Bayou Bridge Pipeline since at least 2017. GAIN attempted to use local media to influence public opinion in Louisiana and organized robocalls that went out to about 20,000 Louisiana residents urging support for the pipeline.

45. In April 2019, GAIN spokesperson Craig Stevens, revealed that GAIN viewed the Louisiana critical infrastructure law as being aimed at "anti-pipeline protesters across the country [who] have opposed the permitted construction of energy infrastructure projects." Stevens observed in a letter to the editor of the Daily Iberian that, "Thankfully, Louisiana has already taken steps to protect infrastructure investment" against such opposition through "[l[egislation implemented this past August [which] increases the penalty for trespassing and vandalizing critical infrastructure, including pipelines." Stevens further noted that a "number of other states across the country are also considering similar legislation." Craig Stevens,  *Pipeline protests negatively impact Louisianians,* April 9, 2019, https://www.iberianet.com/opinion/letter-to-editor-pipeline-protests-negatively-impact-louisianians/article_a847a72e-5a81-11e9-9382-1bd881c43ed5.html.

---

[1]    Connor Gibson, *State Bills to Criminalize Peaceful Protest of Oil & Gas "Critical Infrastructure,'* March 26, 2019, http://polluterwatch.org/State-Bills-Criminalize-Peaceful-Protest-Oil-Gas-Critical-Infrastructure-pipelines.

**II.      The Louisiana Mid-Content Oil and Gas Association and House Bill 727.**

46. House Bill (HB) 727 contained amendments to Louisiana's Critical Infrastructure laws and was introduced in the state House of Representatives on March 26, 2018 by Representative Major Thibaut. *See* HB 727, annexed hereto as Appendix A.

47. HB 727 was drafted by Tyler Gray, President and General Counsel of the Louisiana Mid-Continent Oil and Gas Association (LMOGA).  The association advertises that it represents "all aspects of the oil and gas industry including exploration, production mid-stream activities, pipeline, refining and marketing." LMOGA, http://www.lmoga.com/.

48. Gray stated in a public forum at Tulane Law School in March 2019 that he followed in Oklahoma's steps, liaising with the Oklahoma Oil and Gas Association, adapting their approach to the existing critical infrastructure law in Louisiana.

49. In some ways, LMOGA's HB 727 went further than the Oklahoma and ALEC model legislation. Where the Oklahoma law prohibited unauthorized entry only on visible above-ground pipeline structures, like interconnections, HB 727 and the resulting law as amended has no limiting feature and includes all aspects and portions of the 125,000 miles of pipelines in the state, most of which run underground.

50. HB 727 also included an inchoate conspiracy offense which provided that if two or more persons conspired to commit unauthorized entry (heretofore a misdemeanor trespass), even without actually committing the trespass, they could be imprisoned with or without hard labor for up to five years and fined up to $10,000.00.

51. HB 727 was sent to the Committee on Administration of Criminal Justice.  During its committee discussion, on April 5, 2018, Representative Thibaut, Representative Stephen Dwight, and Gray appeared in support of the bill. Testimony by those three individuals, as well as the

17

general public, lasted for a few hours. During the initial testimony by the three individuals just named, there were multiple questions by committee members concerning the First Amendment implications of the bill.  From there, there were numerous individuals speaking out in opposition to the bill on similar grounds. Additionally, a list of businesses and names were read as being in support of the bill and among that list, there were almost 20 energy companies, or individuals on behalf of an energy company.

52. The bill was voted on favorably in committee and went back to the House for a floor debate on April 12, 2018.  On April 12, 2018, HB 727 passed out of the house and into the senate. The bill was then received in the state senate on April 16, 2018 and referred to Senate Judiciary Committee C. The bill was heard in committee on April 24, 2018, at which time, members of the public and the committee alike expressed concern about the First Amendment and other constitutional implications of the bill. The bill was reported favorably out of committee with amendments and went back to the senate floor.

53. On May 8, 2018, the amended bill was passed out of the Senate.  The amended bill was then passed by the House on May 15, 2018.  It was signed by the Governor on May 30, 2018 and went into effect on August 1, 2018.

54. The statute as amended reads:[*]

>§61. Unauthorized entry of a critical infrastructure
>
>A. Unauthorized entry of a critical infrastructure is any of the following:
>
>(1) The intentional entry by a person without authority into any structure or onto any premises, belonging to another, that constitutes in whole or in part a critical infrastructure that is completely enclosed by any type of physical barrier.

---

[*] Language amending in pipelines and construction sites in bold.

(2) The use or attempted use of fraudulent documents for identification purposes to enter a critical infrastructure.

(3) Remaining upon or in the premises of a critical infrastructure after having been forbidden to do so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person.

(4) The intentional entry into a restricted area of a critical infrastructure which is marked as a restricted or limited access area that is completely enclosed by any type of physical barrier when the person is not authorized to enter that restricted or limited access area.

B. For the purposes of this Section, the following words shall have the following meanings:

(1) "Critical infrastructure" means any and all structures, equipment, or other immovable or movable property located within or upon chemical manufacturing facilities, refineries, electrical power generating facilities, electrical transmission substations and distribution substations, water intake structures and water treatment facilities, natural gas transmission compressor stations, liquified natural gas (LNG) terminals and storage facilities, natural gas and hydrocarbon storage facilities, transportation facilities, such as ports, railroad switching yards, **pipelines**, and trucking terminals, **or any site where the construction or improvement of any facility or structure referenced in this Section is occurring.**

(2) "Fraudulent documents for identification purposes" means documents which are presented as being bona fide documents which provide personal identification information but which are, in fact, false, forged, altered, or counterfeit.

**(3) "Pipeline" means flow, transmission, distribution, or gathering lines, regardless of size or length, which transmit or transport oil, gas, petrochemicals, minerals, or water in a solid, liquid, or gaseous state.**

C. Whoever commits the crime of unauthorized entry of a critical infrastructure shall be imprisoned with or without hard labor for not more than five years, fined not more than one thousand dollars, or both.

D. Nothing in this Section shall be construed to apply to or prevent the following:

(1) Lawful assembly and peaceful and orderly petition, picketing, or demonstration for the redress of grievances or to express ideas or views regarding legitimate matters of public interest, including but not limited to any labor dispute between any employer and its employee or position protected by the United States Constitution or the Constitution of Louisiana.

(2) Lawful commercial or recreational activities conducted in the open or unconfined areas around a pipeline, including but not limited to fishing, hunting, boating, and birdwatching.

(3) Nothing in this Section shall be construed to prevent the owner of an immovable from exercising right of ownership, including use, enjoyment, and disposition within the limits and under the conditions established by law.

55. The problematic inchoate conspiracy offense had been deleted but the open-ended and far-reaching definition of pipelines remained, rendering the law unconstitutionally vague and overbroad.

56. There is no instruction or guidance in the amended law to help law enforcement officers know how to enforce it, or where to enforce it, or who determines when permission to remain on pipeline critical infrastructure has been forbidden.

57. There is no requirement in the amended law that a trespasser do or have any intent to do damage, cause harm, or commit any act of violence or other criminal offense, even though it carries a harsh sentence of imprisonment of up to five years and a heavy fine.

58. There is no indication in the amended law as to what area around a pipeline is to be considered part of the "pipeline" or critical infrastructure.

59. There is no indication in the amended law as to who can revoke permission from those who have lawfully entered onto the pipeline or infrastructure.

60. There is no indication in the amended law as to the rights of a landowner who has either agreed to or has been forced through eminent domain to allow a pipeline to be laid in the ground

on their property and whether the landowner can be forbidden from parts of their property and thus face five years in prison for remaining on the portion of their property that is considered the "pipeline" after being forbidden – and with no intent to do damage or cause harm or commit any other offense.

61. There is no instruction or guidance in the amended law about pipelines that run through public property – under or over sidewalks, parks, roads, streets, or highways – where the public generally has a right to be present.

62. There is no instruction or guidance in the amended law about navigable and public waterways through which pipelines may run and when or how recreational or commercial boaters, fishing vessels or crawfishers may be in violation.

63. There is no instruction or guidance in the amended law about how to determine whether pipelines are present in places where there is no notice or marker, or how to determine if markers are accurate.

64. The law, with all of this vagueness and uncertainty, went into effect on August 1, 2018.

III.    **The Newly Amended Law as Applied to Protesters and a Trespassing Pipeline Company.**

65. At the time the amendments to La. R.S. 14:61 went into effect, the Bayou Bridge Pipeline was being contested in the courts and constructed in St. Martin Parish amid ongoing protests. Because of concerns about the new felony law, plaintiffs White Hat and Mejía, as Water Protectors, as well as plaintiff Savage, a journalist, endeavored to stay on public waterways and/or property where they had authorization to be as they observed and protested.

66. Pipeline construction crews and Water Protectors converged on a very remote 38-acre parcel of property in St. Martin Parish which is only accessible by boat.

67. The property at issue was co-owned by numerous individuals, including plaintiff Landowners – Katherine and Peter Aaslestad, Theda Larson Wright, Alberta Larson Stevens, and Judith Larson Hernandez

68. Landowners Wright, Stevens, and Hernandez had granted the protesters permission to be on the property and contacted the St. Martin Parish Sheriff's Office to communicate this authorization.

69. At the same time, the pipeline company did not have legal authority to be on the property, or to be clearing trees, trenching, or assembling the pipeline.  The company had not concluded voluntary agreements with all the co-owners to enter onto the property and begin construction, nor had it secured a court order allowing it do so through an expropriation proceeding.[2]

70. On July 27, 2018, Peter Aaslestad filed suit against the company accusing it of trespass, and seeking to enjoin its activities on the property.  *See* Petition for Injunction in *Aaslestad v. Bayou Bridge Pipeline, LLC.,* Case No. 87010, 16th Judicial District Court, St. Martin Parish.

71. Shortly thereafter, the pipeline company finally filed an expropriation suit in St. Martin Parish against over 100 co-owners of the property seeking a right of way.  *See Bayou Bridge Pipeline, LLC v 38.00 Acres, More or Less, in St. Martin Parish*; *Barry Scott Carline, et al,* Case No. 87011-e, 16th Judicial District Court, St. Martin Parish.

72. The company only commenced an expropriation proceeding well after it had entered onto and taken control of the property to begin constructing its pipeline, demonstrating that it was

---

[2]       In Louisiana, private pipeline companies have been granted the power of eminent domain, pursuant to La. Const. Art. I, Sec. 4(b)(4) and La. R.S. 19:2(8) and La. R.S. 45:251(1).

fully aware it did not have a legal right at the time to take possession of the proposed route through the Property, clear the path, destroy trees, trench, and construct the pipeline.

73. Despite the fact that it still had no legal authority to be on the property, the company purchased the services of state and local law enforcement officers, specifically personnel from the Louisiana Department of Probation and Parole, Department of Corrections, and officers from the St. Martin Parish Sheriff's Office, to act as private security through Hub Enterprises, a Louisiana-based security firm.

74. These public employees moonlighting as private security appeared at the property wearing clothing that had official state insignia, with official badges, carrying their duty weapons and using official boats and vehicles.

75. These public law enforcement officers, working at times as private security, proceeded over the next several weeks to arrest pipeline opponents on or near the construction site. For example:

    a. On August 18, 2018, the officers arrested four people, including plaintiffs Ramon Mejía and journalist Karen Savage, who were standing away from the pipeline construction beneath a tree, where another woman sat in a tree house, and charged them with unauthorized entry of a critical infrastructure and entering or remaining after being forbidden.

    b. On September 18, officers arrested Savage again and plaintiff Anne White Hat for allegedly having stood on a right of way on the property two weeks earlier, charging them with unauthorized entry of a critical infrastructure. White Hat was also charged with entering or remaining after being forbidden. The right of way did not actually legally exist at the time as the company was later found by a court to have been trespassing.

76. Elsewhere, near another Bayou Bridge Pipeline construction site, on August 9, 2018, officers working as private security arrested two women and one man who were paddling in kayaks on navigable waters and charged them with unauthorized entry of a critical infrastructure under LSA RS 14:61.

77. Every person arrested under the new law was handcuffed, transported to the parish jail in St. Martinville, operated by the St. Martin Parish Sheriff's Office, and made to post bonds of up to $21,000 to be released.

78. One of the people arrested was tasered by law enforcement when she tried to run away.

79. Another person was pepper-sprayed by law enforcement.

80. As of the date of this filing, the charges have not yet been accepted by the District Attorney of St. Martin Parish.

81. On September 10, 2018, in the state court injunction proceeding brought by plaintiff Peter Aaslestad to enjoin Bayou Bridge from continuing to enter and construct upon the same property, the company agreed that, as of that date:

> (a) No officer, employee, agent, contractor, subcontractor, or other at the direction of or on behalf of Bayou Bridge shall enter onto the property that is the subject [of that matter]; and (b) no officer, employee, agent, contractor, subcontractor, or other at the direction of or on behalf of Bayou Bridge shall clear, trench, string, lay pipe, backfill, tie-in pipeline segments, or perform any other preconstruction and/or construction-related activities for Bayou Bridge's pipeline on the property that I the subject [of that matter]. *See Aaslestad v. Bayou Bridge Pipeline, LLC,* Case No. 87010, Agreement of the Parties, Sept 10, 2018.

82. The trial for the expropriation proceeding brought by the pipeline company took place from November 27-29, 2018, in St. Martinville. A representative of the pipeline company testified during trial that the company made a business decision to trespass on the property and begin constructing the pipeline without having concluded easement agreements with all of the

co-owners or obtaining an expropriation judgment because the company considered it less expensive to violate the law than to adhere to it.

83. On December 6, 2018, the trial court issued its judgment finding that the pipeline company had committed trespass and awarding nominal damages to three of the co-owners.

84. The fact that so many protesters have been arrested on property where they had permission to enter and where it was the pipeline company that was knowingly trespassing demonstrates clearly that the law as amended is subject to arbitrary and discriminatory enforcement.

IV.    **Plaintiffs Do Not Have Adequate Notice of What Conduct Is Prohibited and Are Concerned About Their Ability to Exercise their First Amendment Rights to Peacefully Protest Pipeline Projects They Believe Are Harmful to People and the Environment.**

A. *Plaintiffs Arrested and Charged with Felonies Under the New Law*

85. Plaintiffs Anne White Hat, Ramon Mejía, and Karen Savage, have all been arrested and charged under La. R.S. 14:61 and are now facing the possibility of prosecution and five years in prison and heavy fines on each of their charges.

86. They were all arrested and charged with unauthorized entry of a critical infrastructure on property where they had permission from co-owners to enter and remain, and when the company building the pipeline was itself trespassing and illegally constructing where it did not have a valid right of way.

87. White Hat and Savage were arrested on September 18, 2018 -- two weeks after they were alleged to have committed unauthorized entry of a critical infrastructure on September 3, 2018.

88. The affidavit for Savage's arrest warrant stated that she was "in violation of La. R.S. 14:61 Unauthorized entry of a critical infrastructure" because she "walked onto the top of the

berm," which was in an alleged, but actually non-existent, right of way, and "was taking pictures."

89.  The affidavit for White Hat's arrest states that for one of the charges under La. R.S. 14:61, she was "on the pipeline right of way" with approximately 30-35 other protesters. For the second charge under La. R.S. 14:61, the affidavit  states that White Hat "started to walk back up the incline," which according to the affidavit was in the right of way, but then noted that she moved off the incline along with others after discussion with officers.

90. These two actions – walking onto a non-existent right of way and then moving off of it after discussion with officers, and standing on a berm and taking photographs – served as the basis of the felony charges for which they now face up to 5 years in prison on each.

91. Savage was arrested another time along with Ramon Mejía on August 18, 2018. According to the warrant affidavits, they were "standing beneath a 'tree house,'" in which a person was sitting in protest near the site. When Savage and Mejía allegedly remained where they were standing thirty minutes after being told to leave, they were arrested and charged with "Remaining After Being Forbidden" under La. R.S. 14:63, a misdemeanor. While transporting Savage and Mejia were being transported to the jail, the arresting officer stated that another officer had arrived on the scene and advised him that Savage, Mejía, and the other two people arrested had been in the right of way, after which they were also charged with felony unauthorized entry of a critical infrastructure under La. R.S. 14:61.

92. Again, the pipeline company itself was on the property illegally and there was no legal right of way in existence, and therefore no critical infrastructure, at the time these plaintiffs were arrested and charged with felonies for unauthorized entry of critical infrastructure.

93. They now have felony charges and the threat of prosecution hanging over them which has substantial and numerous impacts on their lives.

### B. Landowners

94. As owners of property with pipelines running through it, plaintiff Landowners have a direct and immediate stake in the amendment to La. R.S. 14:61. The law as amended does not give them sufficient notice of where they can be on their own property, nor who has final say as to whether permission to be on their property, or certain parts of their property, can be revoked from them.

95. Plaintiffs Wright, Stevens, and Hernandez have in the past expressly granted permission to peaceful non-violent protesters to be on their property to engage in and express their opposition to the project, and to monitor and document the company's illegal presence on and destruction of trees and land, which has been in their family for generations.  They intend to continue to find ways to advocate for transition away from fossil fuels and toward a more just climate- and earth-centered approach to energy. They intend to continue to support Water Protectors and desire to exercise their rights of assembly and association. They may consider allowing guests, including journalists, back on their land for monitoring, evaluation, educational, and awareness-raising purposes.

96. All the plaintiff Landowners are concerned, however, about the vagueness of the law as it applies to their property and their rights as owners now that the pipeline company has an easement and right of way on their property, which was only granted by a Court after it found the company had committed trespass when it constructed its pipeline.

***St. James Community Advocates and RISE St. James***

97. Plaintiff Sharon Lavigne is a vocal opponent of the stream of new petrochemical facilities attempting to locate in her community. She is a founding member and director of RISE St. James, which was created as a way for people in the community to come together to oppose such projects.

98. Through RISE, she and others have organized marches, press conferences, and events in the area to express their anger about and opposition to the attempted petrochemical buildout, including a march through Cancer Alley.

99. Likewise, plaintiff Harry Joseph is concerned how the law can be used to discourage and chill protest against, as well as observation and monitoring of, controversial petrochemical projects, given the proliferation of pipelines in the area.

100.    Lavigne and Joseph are concerned the law could be used against them and others in RISE and in the broader community as they necessarily march and protest in the vicinity of pipelines given that their community is overrun by the industry and its infrastructure.

***350 New Orleans***

101.    As a volunteer climate activist group, 350 New Orleans intends to continue its activism and advocacy in support of policies and laws aimed at slowing or reversing the climate crisis, and at ensuring environmental justice for communities that have borne a disproportionate share of the burden of pollution from the fossil fuel industry through negative health impacts, lives lost, and contamination and destruction of their land.

102.    Local members intend to continue to advocate for climate justice and advocate, educate about and peacefully and non-violently protest environmental injustices in Louisiana, including opposition to pipeline projects.

103.     While members have engaged in acts of peaceful, non-violent civil disobedience and have even been arrested and incurred misdemeanors charges when protesting near pipeline construction sites in the past, they are concerned that similar non-violent speech and expression could subject them to felony charges and harsh and lengthy sentences of imprisonment. This concern and the threat of felony prosecutions has had a chilling effect on their political speech and advocacy.

104.     Their work and political advocacy are directly impacted by the amendment to La. R.S. 14:61 as it severely increases the punishment for presence on or near pipelines. Given the vagueness of the critical infrastructure law  and the arbitrary and discriminatory way in which it has already been enforced, members are concerned that they do not have a way to know what conduct is prohibited and where, and what could subject them to a possible prison sentence of five years, along with the possibility of steep fines.

*Louisiana Bucket Brigade*

105.     As an environmental health and justice organization based in New Orleans that works with communities in Louisiana located near oil refineries and chemical plants, the Bucket Brigade is often necessarily in the vicinity of pipelines. The vagueness and open-ended language of the law as it regards pipelines means that the organization and its members cannot have sufficient notice of what they can and cannot do and where and when exactly they can or cannot do it.

106.     Bucket Brigade staff and members intend to continue to advocate, educate about and protest against environmental injustices, including those enabled by pipeline projects. Part of the Bucket Brigade's work involves training and assisting communities in getting air quality

samples, as well as monitoring projects like pipeline construction for adherence to regulatory and permit requirements.

107.     The Bucket Brigade also does filming and interviews on location in neighborhoods and communities where there are pipelines that are part of the petrochemical infrastructure. Bucket Brigade staff and members have also engaged in peaceful, non-violent protests at project sites.

108.     Their work and political advocacy are directly impacted and chilled by the amendment to La. R.S. 14:61 as it severely increases the punishment for remaining on or, possibly near, pipelines and its members are concerned about the possibility of arrests and felony charges, not only for their protest and expressive conduct but also for their work monitoring and documenting violations.

## COUNT I – AS AMENDED, LA. R.S. 14:61 IS UNCONSTITUTIONALLY VAGUE
### (Fourteenth Amendment: Void for Vagueness)

109.     Plaintiffs hereby incorporate previous paragraphs as if set forth fully herein.

110.     The amendments to La. R.S. 14:61 violate the right to due process under the Fourteenth Amendment to the United States Constitution because they are vague and do not provide sufficient notice of what conduct is prohibited and invite discretionary and arbitrary enforcement.

111.     The addition of approximately 125,000 miles of pipelines, much of which is invisible and unmarked, to the definition of critical infrastructure in La. R.S. 14:61 renders the law vague and subject to arbitrary and discriminatory enforcement.

112.      As the facts alleged above demonstrate, as amended La. R.S. 14:61 is unconstitutionally vague because it fails to precisely define and does not clarify what constitutes

impermissible trespass in areas of public access like sidewalks, roads, parks, navigable waterways or in areas that are not fenced off or clearly marked.

113.    The law provides no clear guidance to Plaintiffs, and others similarly situated, as well as law enforcement as to how it should be interpreted and applied in this regard, and it invites discretionary and arbitrary enforcement in violation of the Fourteenth Amendment to the U.S. Constitution.

114.    Such violations cause and will continue to cause Plaintiffs irreparable harm unless enjoined by this Court.

115.    Accordingly, La. R.S. 14:61 should be declared unconstitutional and its enforcement should be enjoined.

## COUNT II – AS AMENDED, LA. R.S. 14:61 VIOLATES PLAINTIFFS' RIGHTS UNDER THE FIRST AMENDMENT TO THE U.S. CONSTITUTION

116.    Plaintiffs hereby incorporate all the paragraphs above as if set forth fully herein.

117.    The First Amendment to the United States Constitution, enforceable to the State of Louisiana through the Fourteenth Amendment and pursuant to 42 U.S.C. § 1983, provides that no law shall abridge the freedom of speech, or of the press, or the right of peaceful assembly.

118.     As amended, La. R.S. 14:61 violates Plaintiffs' First Amendment rights to speech and of the press, and assembly.

119.    Plaintiffs White Hat and Mejía have already been arrested and charged with felonies under this law for walking onto and standing in what was deemed to be critical infrastructure in the course of exercising their First Amendment rights to speech and expressive conduct opposing the pipeline project and attempting to alert authorities and the public about the

pipeline company's illegal presence on the property. For that they face the possibility of prosecution and up to five years imprisonment and heavy fines on each of the charges.

120.    Plaintiff Savage, a journalist, was arrested and charged with felonies under the amended law for standing and taking pictures on what was deemed critical infrastructure in the course of covering the events in the exercise of the First Amendment right of the press. She faces prosecution and a combined 10 years under the amended law. With two felony charges hanging over her head, she now hesitates to continue to cover not only pipeline protests but other hotly contested issues as well.

121.    Plaintiff landowners and environmental and racial justice advocates are concerned and chilled in the exercise of their First Amendment rights to speech and expressive conduct as well as their rights of assembly.  They are worried about how the amended law will be applied and do not want to risk a felony arrest in order to protest.

122.    As amended, La. R.S. 14:61 impermissibly prohibits Plaintiffs from exercising their constitutionally protected right to speech and expressive conduct, as well as assembly and the press, and thereby violates the First Amendment to the U.S. Constitution.  Such violations cause and will continue to cause Plaintiffs irreparable harm unless enjoined by this Court.

## COUNT III – AS AMENDED, LA. R.S. 14:61 VIOLATES PLAINTIFFS' RIGHTS UNDER THE FIRST AMENDMENT TO THE U.S. CONSTITUTION BECAUSE IT SINGLES OUT A PARTICULAR VIEWPOINT FOR HARSHER PUNISHMENT

123.    Plaintiffs hereby incorporate all the paragraphs above as if set forth fully herein.

124.    As amended, La. R.S. 14:61 violates the First Amendment to the United States Constitution because it singles out a particular viewpoint for harsher punishment.

125.     The amendments to the law were drafted and introduced through a legislator by LMOGA to discourage protesters from expressing their opposition near pipelines and/or pipeline construction sites.

126.     It is well established that an official or anyone acting under the color of law cannot restrict speech based on the viewpoint expressed, whether in a public or nonpublic forum. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384, 392-3 (1993).

127.     The United States Supreme Court has recognized that the First Amendment protects the right to protest.  When the First Amendment is involved, "[t]he very existence of a censorial power, regardless of how or whether it is exercised, is unacceptable."  *Int'l Soc'y For Krishna Consciousness v. Eaves*, 601 F.2d 809, 822-23 (5th Cir. 1979).

128.     As amended, La. R.S. 14:61 unconstitutionally discriminates against speech based on viewpoint because, as detailed above, and as evidenced by the law's application to protestors who express opposition to pipelines, the law was proposed and enacted for the purpose of imposing harsh penalties on those who, like Plaintiffs, oppose pipelines.

129.     Accordingly, La. R.S. 14:61 should be declared unconstitutional and its enforcement should be enjoined.

### COUNT IV – LA R.S. 14:61 IS UNCONSTITUTIONALLY OVERBROAD IN VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION

130.     Plaintiffs hereby incorporate previous paragraphs as if fully set forth herein.

131.     The United States Supreme Court has recognized that where a law "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep," a court may inhibit "all enforcement of that law, until and unless a limiting construction

or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (internal citations omitted).

132.    Moreover, a statute is facially overbroad where there exists "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court." *City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).

133.    The inclusion of approximately 125,000 miles of pipelines into the definition of critical infrastructure renders the law overbroad as it reaches a substantial amount of protected speech and expressive conduct in violation of the First Amendment.

134.    As amended, La. R.S. 14:61 is thus unconstitutionally overbroad in violation of the First Amendment to the U.S. Constitution.  This constitutional violation causes and will continue to cause Plaintiffs irreparable harm unless enjoined by this Court.

135.    Accordingly, amendments to La. R.S. 14:61 should be declared unconstitutional and its enforcement should be enjoined.

## COUNT V - LA. R.S. 14:61 IS UNCONSTITUTIONAL AS APPLIED

136.    As the facts above indicate, the law in question is being unconstitutionally applied in violation of the First and Fourteenth Amendments to the US Constitution.

137.    Accordingly, La. R.S. 14:61 should be declared unconstitutional and its enforcement should be enjoined.

## RELIEF SOUGHT

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a.  Declaring that La. R.S. 14:61, as amended to include pipelines, is unconstitutionally vague under the Fourteenth Amendment to the United States Constitution;

b.  Declaring that La. R.S. 14:61, as amended to include pipelines, violates the Plaintiffs' rights to freedom of expression under the First Amendment to the United States Constitution;

c.  Declaring that La. R.S. 14:61, as amended to include pipelines, violates the Plaintiffs' rights to freedom of the press under the First Amendment to the United States Constitution;

d.  Declaring that La. R.S. 14:61, as amended to include pipelines, violates the Plaintiffs' rights to assembly under the First Amendment to the United States Constitution;

e.  Declaring that La. R.S. 14:61, as amended to include pipelines, is facially and unconstitutionally overbroad under the First Amendment to the United States Constitution;

f.  Declaring that La. R.S. 14:61, as amended to include pipelines, is unconstitutional as it singles out a particular viewpoint for harsher punishment

g.  Declaring that La. R.S. 14:61, as amended to include pipelines, is unconstitutional as applied under the First and Fourteenth Amendments to the United States Constitution;

h.  Entering a preliminary injunction enjoining Defendants from enforcing or causing any other state actor to enforce La. R.S. 14:61 as it pertains to pipelines and, thereafter, entering a permanent injunction prohibiting enforcement of recent amendments to La. R.S. 14:61 pertaining to pipelines;

i.  Awarding Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

j.  Granting such other and further relief as the Court deems just and proper.

Date:  May 22, 2019                          Respectfully submitted,


                                             s/Pamela C. Spees
                                             Pamela C. Spees
                                             La. Bar Roll No.  29679
                                             Astha Sharma Pokharel
                                             *Pro Hac Vice* Motion Pending
                                             Center for Constitutional Rights
                                             666 Broadway, 7th Floor
                                             New York, NY 10012
                                             Tel & Fax (212) 614-6431
                                             pspees@ccrjustice.org
                                             asharmapokharel@ccrjustice.org

                                             William P. Quigley
                                             La. Bar Roll No. 7769
                                             Professor of Law
                                             Loyola University College of Law
                                             7214 St. Charles Avenue
                                             New Orleans, LA 70118
                                             Tel. (504) 710-3074
                                             Fax (504) 861-5440
                                             quigley77@gmail.com

# Appendix A

HLS 18RS-1314                                                    **<u>ORIGINAL</u>**

2018 Regular Session

HOUSE BILL NO. 727

BY REPRESENTATIVES THIBAUT, ABRAHAM, AMEDEE, ANDERS, BAGLEY, BERTHELOT, BILLIOT, BISHOP, TERRY BROWN, CARMODY, STEVE CARTER, CHANEY, COUSSAN, CREWS, CROMER, DANAHAY, DAVIS, DEVILLIER, DWIGHT, EDMONDS, EMERSON, GUINN, LANCE HARRIS, HAVARD, HAZEL, HENSGENS, HODGES, HOFFMANN, HORTON, HOWARD, HUVAL, LEBAS, LEOPOLD, MACK, MAGEE, MCFARLAND, MIGUEZ, JIM MORRIS, POPE, PUGH, PYLANT, RICHARD, SCHEXNAYDER, SEABAUGH, STAGNI, STEFANSKI, TALBOT, THOMAS, WRIGHT, AND ZERINGUE AND SENATORS BOUDREAUX, CHABERT, CLAITOR, CORTEZ, ERDEY, HEWITT, JOHNS, LAFLEUR, LAMBERT, MORRISH, RISER, THOMPSON, WALSWORTH, AND WHITE

CRIME:  Provides relative to unauthorized entry of and criminal damage to a critical infrastructure

1                                       AN ACT

2   To amend and reenact R.S. 14:61(B)(1) and (C) and to enact R.S. 14:61(B)(3), 61.1, and

3        61.2, relative to offenses involving critical infrastructure; to provide relative to the

4        crime of unauthorized entry of a critical infrastructure; to amend the definition of

5        "critical infrastructure"; to provide for a definition of "pipeline"; to amend penalties

6        for the crime of unauthorized entry of a critical infrastructure; to create the crime of

7        criminal damage to critical infrastructure; to provide for elements of the offense; to

8        provide for criminal penalties; to provide relative to court costs and costs of

9        investigation; to provide for restitution; to create the crime of conspiracy to engage

10       in unauthorized entry of a critical infrastructure or in criminal damage to a critical

11       infrastructure; to provide for elements of the offense; to provide for criminal

12       penalties; and to provide for related matters.

13   Be it enacted by the Legislature of Louisiana:

14       Section 1.  R.S. 14:61(B)(1) and (C) is hereby amended and reenacted and R.S.

15   14:61(B)(3), 61.1, and 61.2 are hereby enacted to read as follows:

Page 1 of 5

CODING:  Words in ~~struck through~~ type are deletions from existing law; words <u>underscored</u> are additions.

1    §61.  Unauthorized entry of a critical infrastructure

2                              *        *        *

3            B.  For the purposes of this Section, the following words shall have the

4    following meanings:

5            (1) "Critical infrastructure" ~~shall include but not be limited to~~ means any and

6    all structures, equipment, or other immovable or movable property located within or

7    upon chemical manufacturing facilities, refineries, electrical power generating

8    facilities, electrical transmission substations and distribution substations, water

9    intake structures and water treatment facilities, natural gas transmission compressor

10   stations, liquified natural gas (LNG) terminals and storage facilities, natural gas and

11   hydrocarbon storage facilities, ~~and~~ transportation facilities, such as ports, railroad

12   switching yards, pipelines, and trucking terminals, or any site where the construction

13   or improvement of any facility or structure referenced in this Section is occurring.

14                             *        *        *

15           (3)  "Pipeline" means flow, transmission, distribution, or gathering lines,

16   regardless of size or length, which transmit or transport oil, gas, petrochemicals,

17   minerals, or water in a solid, liquid, or gaseous state.

18           C.   Whoever commits the crime of unauthorized entry of a critical

19   infrastructure shall be imprisoned with or without hard labor for not more than five

20   years, fined not more than one thousand dollars ~~or imprisoned with or without hard~~

21   ~~labor for not more than six years~~, or both.

22                             *        *        *

23   §61.1.  Criminal damage to a critical infrastructure

24           A.  Criminal damage to a critical infrastructure is the intentional damaging

25   of a critical infrastructure as defined in R.S. 14:61.

26           B.  Any person who commits the crime of criminal damage to a critical

27   infrastructure shall be imprisoned with or without hard labor for not less than one

28   year nor more than fifteen years, fined not more than ten thousand dollars, or both.

CODING:  Words in ~~struck through~~ type are deletions from existing law; words underscored
are additions.

1      C.  Any person who commits the crime of criminal damage to a critical

2  infrastructure wherein it is foreseeable that human life will be threatened or

3  operations of a critical infrastructure will be disrupted as a result of such conduct

4  shall be imprisoned at hard labor for not less than six years nor more than twenty

5  years, fined not more than twenty-five thousand dollars, or both.

6      D.  Any person convicted under the provisions of this Section may be

7  assessed court costs and the costs of investigation and prosecution reasonably

8  incurred.  The funds received for the costs of investigation shall be remitted to the

9  law enforcement agency conducting such investigation.

10      E.  In addition to the penalties provided by the provisions of this Section, a

11  person convicted under the provisions of this Section may be ordered to make full

12  restitution to the owner of the property.  If a person ordered to make restitution is

13  found to be indigent and therefore unable to make restitution in full at the time of

14  conviction, the court shall order a periodic payment plan consistent with the person's

15  ability to pay.

16  §61.2.  Conspiracy to engage in unauthorized entry of a critical infrastructure or to

17      engage in criminal damage to a critical infrastructure

18      A.  If two or more persons conspire to violate R.S. 14:61, each person shall

19  be imprisoned with or without hard labor for not more than five years, fined not more

20  than ten thousand dollars, or both.

21      B.  Except as provided in Subsection C of this Section, if two or more

22  persons conspire to violate R.S. 14:61.1, each person shall be imprisoned with or

23  without hard labor for not less than one year nor more than fifteen years, fined not

24  more than one hundred thousand dollars, or both.

25      C.  If two or more persons conspire to violate R.S. 14:61.1 wherein it is

26  foreseeable that human life will be threatened or operations of a critical

27  infrastructure will be disrupted as a result of such conduct, each person shall be

28  imprisoned at hard labor for not less than six years nor more than twenty years, fined

29  not more than two hundred fifty thousand dollars, or both.

CODING:  Words in ~~struck through~~ type are deletions from existing law; words underscored
are additions.

HLS 18RS-1314                                                **ORIGINAL**
                                                            HB NO. 727

---

DIGEST

The digest printed below was prepared by House Legislative Services. It constitutes no part of the legislative instrument. The keyword, one-liner, abstract, and digest do not constitute part of the law or proof or indicia of legislative intent. [R.S. 1:13(B) and 24:177(E)]

---

HB 727 Original              2018 Regular Session              Thibaut

**Abstract:** Amends the crime of unauthorized entry of a critical infrastructure and creates the crime of criminal damage to a critical infrastructure and the crime of conspiracy to commit either of these offenses.

Present law provides for the crime of unauthorized entry of a critical infrastructure and defines critical infrastructure as any chemical manufacturing facility, refinery, electrical power generating facility, electrical transmission substation and distribution substation, water intake structure and water treatment facility, natural gas transmission compressor station, liquified natural gas (LNG) terminal and storage facility, natural gas and hydrocarbon storage facility, and transportation facility, such as ports, railroad switching yards, and trucking terminals.

Proposed law amends the present law definition of "critical infrastructure" to do both of the following:

(1)     Include any and all structures, equipment, or other immovable or movable property located within or upon such facilities, including any site where the construction or improvement of any such facility or structure is occurring.

(2)     Include "pipeline" which is defined by proposed law to mean flow, transmission, distribution, or gathering lines, regardless of size or length, which transmit or transport oil, gas, petrochemicals, minerals, or water in a solid, liquid, or gaseous state.

Present law provides that whoever commits the crime of unauthorized entry of a critical infrastructure shall be fined not more than $1,000 or imprisoned with or without hard labor for not more than six years, or both.

Proposed law amends the present law penalties to provide that such persons shall be imprisoned with or without hard labor for not more than five years, fined not more than $1,000, or both.

Proposed law creates the crime of criminal damage to a critical infrastructure and defines it as the intentional damaging of a critical infrastructure as defined by present law. Further provides for the following penalties:

(1)     Imprisonment with or without hard labor for not less than one year nor more than 15 years, a fine of not more than $10,000, or both.

(2)     If it is foreseeable that human life will be threatened or operations of a critical infrastructure will be disrupted as a result of the conduct - imprisonment at hard labor for not less than six years nor more than 20 years, a fine of not more than $25,000, or both.

Proposed law provides that any person convicted of this offense may be assessed court costs and the costs of investigation and prosecution reasonably incurred, with the funds received for the costs of investigation being remitted to the law enforcement agency conducting the investigation.

CODING: Words in ~~struck through~~ type are deletions from existing law; words underscored are additions.

HLS 18RS-1314                                                    **ORIGINAL**
                                                                HB NO. 727

<u>Proposed law</u> authorizes the court to order that the person make full restitution to the owner of the property either by payment in full or under a periodic payment plan consistent with the person's ability to pay.

<u>Proposed law</u> creates the crime of conspiracy to engage in unauthorized entry of a critical infrastructure or to engage in criminal damage to a critical infrastructure, and provides for the following penalties:

(1)    If two or more persons conspire to commit the crime of unauthorized entry of a critical infrastructure, each person shall be imprisoned with or without hard labor for not more than five years, fined not more than $10,000, or both.

(2)    If two or more persons conspire to commit criminal damage to a critical infrastructure, each person shall be imprisoned with or without hard labor for not less than one year nor more than 15 years, fined not more than $100,000, or both.

(3)    If two or more persons conspire to commit criminal damage to a critical infrastructure wherein it is foreseeable that human life will be threatened or operations of a critical infrastructure will be disrupted as a result of such conduct, each person shall be imprisoned at hard labor for not less than six years nor more than 20 years, fined not more than $250,000, or both.

(Amends R.S. 14:61(B)(1) and (C); Adds R.S. 14:61(B)(3), 61.1, and 61.2)

CODING:  Words in ~~struck through~~ type are deletions from existing law; words <u>underscored</u> are additions.