# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

ANNE WHITE HAT, RAMON MEJIA,
KAREN SAVAGE, SHARON LAVIGNE,
HARRY JOSEPH, KATHERINE
AASLESTAD, PETER AASLESTAD,
THEDA LARSON WRIGHT, ALBERTA
LARSON STEVENS, JUDITH LARSON
HERNANDEZ, RISE ST. JAMES, 350 NEW
ORLEANS, and LOUISIANA BUCKET
BRIGADE,

VERSUS

JEFF LANDRY, in his official capacity as
Attorney General of Louisiana, BO DUHE, in his
official capacity as District Attorney of the 16th
Judicial District Attorney's Office; RONALD J.
THERIOT, in his official capacity as Sheriff of
St. Martin Parish,

CIVIL ACTION

NO.  19-322-JWD-EWD

## RULING AND ORDER

This matter comes before the Court on three motions to dismiss: *Attorney General Jeff Landry's Motion to Dismiss* ("*Attorney General's Motion*") filed by Attorney General Jeff Landry, in his official capacity ("Attorney General") (Doc. 30); *Sheriff's Motion to Dismiss* ("*Sheriff's Motion*") filed by Sheriff Ronald Theriot ("Sheriff") (Doc. 31) and *Motion to Dismiss; Alternatively to Transfer to the United States District Court tor the Western District of Louisiana Filed on behalf of M. Bofill Duhé in his Official Capacity as District Attorney for the 16th Judicial District, State of Louisiana* ("*District Attorney's Motion*") filed by District Attorney M. Bofill Duhé ("District Attorney") (Doc. 32). Plaintiffs oppose the motions to dismiss. (Docs. 34, 35, and 36.) The defendants have filed replies. (Docs. 39, 40, 41.) Oral argument is not necessary. Having considered the facts alleged in the *Complaint*, the arguments raised by the parties, the applicable law, and for the reasons expressed below, the Court grants in

part *Attorney General Jeff Landry's Motion to Dismiss* and grants the alternative relief requested and will transfer the case to the Western District of Louisiana under 28 U.S.C. § 1404(a).

<u>FACTUAL BACKGROUND</u>

Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988 alleging that the 2018 amendment to La. R.S. 14:61 ("Amended Statute"), which prohibits unauthorized entry of critical infrastructure, is facially unconstitutional and unconstitutional as applied. (Doc. 1 at 1.) For the purposes of this *Ruling and Order*, the Court accepts the well pleaded allegations in the *Complaint* as true. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502-03 (5th Cir. 2014).

   *a.  Claims alleged in the Complaint*

Plaintiffs allege five counts in the *Complaint*:

1. Count I – As amended, La. R.S. 14:61 is unconstitutionally vague (Fourteenth Amendment: Void for Vagueness).

2. Count II – As amended, La. R.S. 14:61 violates Plaintiffs' Rights under the First Amendment to the U.S. Constitution.

3. Count III - As amended, La. R.S. 14:61 violates Plaintiffs' Rights under the First Amendment to the U.S. Constitution because it singles out a particular viewpoint for harsher punishment.

4. Count IV – La. R.S. 14:61 is unconstitutionally overbroad in violation of the First Amendment to the U.S. Constitution.

5. Count V – La. R.S. 14:61 is unconstitutional as applied.

   *b.  The enactment of La. R.S. 14:61*

In 2018, the Louisiana Mid-Continent Oil and Gas Association drafted and proposed an amendment to La. R.S. 14:61, which was enacted into law on August 1, 2018. (Doc. 1 at ¶ 1.) The Amended Statute reads:

§61. Unauthorized entry of a critical infrastructure

A. Unauthorized entry of a critical infrastructure is any of the following:

(1) The intentional entry by a person without authority into any structure or onto any premises, belonging to another, that constitutes in whole or in part a critical infrastructure that is completely enclosed by any type of physical barrier.

(2) The use or attempted use of fraudulent documents for identification purposes to enter a critical infrastructure.

(3) Remaining upon or in the premises of a critical infrastructure after having been forbidden to do so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person.

(4) The intentional entry into a restricted area of a critical infrastructure which is marked as a restricted or limited access area that is completely enclosed by any type of physical barrier when the person is not authorized to enter that restricted or limited access area.

B. For the purposes of this Section, the following words shall have the following meanings:

(1) "Critical infrastructure" means any and all structures, equipment, or other immovable or movable property located within or upon chemical manufacturing facilities, refineries, electrical power generating facilities, electrical transmission substations and distribution substations, water intake structures and water treatment facilities, natural gas transmission compressor stations, liquified natural gas (LNG) terminals and storage facilities, natural gas and hydrocarbon storage facilities, transportation facilities, such as ports, railroad switching yards, **pipelines**, and trucking terminals, **or any site where the construction or improvement of any facility or structure referenced in this Section is occurring.**

(2) "Fraudulent documents for identification purposes" means documents which are presented as being bona fide documents which provide personal identification information but which are, in fact, false, forged, altered, or counterfeit.

**(3) "Pipeline" means flow, transmission, distribution, or gathering lines, regardless of size or length, which transmit or transport oil, gas, petrochemicals, minerals, or water in a solid, liquid, or gaseous state.**

C. Whoever commits the crime of unauthorized entry of a critical infrastructure shall be imprisoned with or without hard labor for not more than five years, fined not more than one thousand dollars, or both.

D. Nothing in this Section shall be construed to apply to or prevent the following:

(1) Lawful assembly and peaceful and orderly petition, picketing, or demonstration for the redress of grievances or to express ideas or views regarding legitimate matters of public interest, including but not limited to any labor dispute between any employer and its employee or position protected by the United States Constitution or the Constitution of Louisiana.

(2) Lawful commercial or recreational activities conducted in the open or unconfined areas around a pipeline, including but not limited to fishing, hunting, boating, and birdwatching.

(3) Nothing in this Section shall be construed to prevent the owner of an immovable from exercising right of ownership, including use, enjoyment, and disposition within the limits and under the conditions established by law.

(Doc. 1 at ¶ 54 (emphasis added in *Complaint* to highlight amended language of pipelines and construction sites).)

The Amended Statute defines Louisiana's 125,000-mile network of pipelines as critical infrastructure. (*Id.*) Plaintiffs allege that the Amended Statute:

is unconstitutional on its face and as applied because: 1) it is vague as it does not provide adequate notice to plaintiffs and others, as well as state actors who must enforce the law, what conduct is prohibited and where, and allows for arbitrary and discriminatory enforcement; 2) it is overbroad and has the effect of chilling constitutionally protected speech or expression; and 3) targets speech and expressive conduct with a particular viewpoint for harsher punishment.

(Doc. 1 at ¶ 2.)

Prior to the statute's amendment, critical infrastructure included "facilities like refineries, chemical manufacturing facilities, and water treatment plants which occupy visible and discrete land areas often completely enclosed by physical barriers and/or clearly demarcated by signs." (Doc. 1 at ¶ 3.) The prior version, therefore, "gave notice to those who would enter such facilities

without authorization, or remain after being forbidden, that they were on specially designated and protected property." (*Id.*) As amended, critical infrastructure now includes 125,000 miles of pipelines, which run through private and public spaces and are not visible or clearly marked. (Doc. 1 at ¶¶ 4-5.) There is no indication as to what area around a pipeline is considered a part of the pipeline or critical infrastructure. (Doc. 1 at ¶ 58.) Further, there is no indication whether landowners have a right to be present on the part of their private property considered a pipeline, and whether pipelines that run unmarked through public property or in navigable waterways are forbidden areas. (Doc. 1 at ¶¶ 60-62.)

The Amended Statute does not define who can revoke permission from those who have lawfully entered onto the pipeline or infrastructure, or who determines when permission to remain on a pipeline has been forbidden. (Doc. 1 at ¶¶ 56, 59.) The Amended Statute does not provide guidance to law enforcement officers on how or where to enforce it. (Doc. 1 at ¶ 56.) There is no requirement that a trespasser have intent to do damage, cause harm, or otherwise commit an act of violence or criminal offense. (Doc. 1 at ¶ 57.)

The Amended Statute also increased the penalty for engaging in peaceful demonstrations or civil disobedience in the vicinity of pipelines or pipeline construction sites from a misdemeanor charge of trespass to a felony charge of five years imprisonment, with or without hard labor, and up to a $1,000.00 fine. (Doc. 1 at ¶ 7.)

    *c.  The Bayou Bridge Pipeline*

The Bayou Bridge Pipeline runs 162.5 miles from Lake Charles to St. James through 700 bodies of water, including the Atchafalaya Basin and Bayou LaFourche, which is the source of drinking water for the surrounding communities. (Doc. 1 at ¶ 8.) The construction of the Bayou Bridge Pipeline was controversial with community opposition from the affected communities,

indigenous leaders, environmental activists, crawfishers, and landowners voicing opposition. (*Id.* at ¶ 9.) Further state and federal lawsuits were filed opposing the construction. (*Id.*)

While constructing the Bayou Bridge Pipeline, the pipeline company attempted to enter into voluntary agreements with all co-owners of a 38-acre property in St. Martin Parish ("Property"). (Doc. 1 at ¶ 69.) Plaintiffs, Katherine and Peter Aaslestad, Theda Larson Wright, Alberta Larson Stevens, and Judith Larson Hernandez, are fractional co-owners of the Property. (*Id.* at ¶ 67.) The pipeline company started construction on the Property, clearing a path, destroying trees, digging a trench, without all of the co-owner's consent and without a court order allowing an expropriation. (*Id.* at 69.) Peter Aaslestad filed suit against the pipeline company in state court alleging trespass and seeking to enjoin further activity on the Property. (*Id.* at ¶ 70.) The pipeline company responded by filing an expropriation suit seeking a right of way. (Doc. 1 at ¶ 71.)

Peter Aaslestad was successful in obtaining an injunction from continuing to enter and construct on the Property. (Doc. 1 at ¶ 81.) During the state court trial in the expropriation suit, "[a] representative of the pipeline company testified . . . that the company made a business decision to trespass on the property and begin constructing the pipeline without having concluded easement agreements with all of the co-owners or obtaining an expropriation judgment because the company considered it less expensive to violate the law than to adhere to it." (Doc. 1 at ¶ 82.) The trial court found that the pipeline company committed trespass and awarded nominal damages to three of the co-owners. (*Id.* at ¶ 83.)

### d. *Private security at the Property*

Before it was enjoined from entering and constructing on the property on October 10, 2018 by the 16th Judicial District Court, St. Martin Parish in the state court suit *Aaslestad v. Bayou Bridge Pipeline, LLC.,* Case No. 87010, and while it was constructing on the Property

without legal authority, the pipeline company hired private security through Hub Enterprises. (Doc. 1 at ¶ 73.) Hub Enterprises employed personnel from the Louisiana Department of Probation and Parole, Department of Corrections, and officers from the St. Martin Parish Sheriff's Office, as private security officers. (*Id.*) The private security officers patrolled the construction site while wearing clothing with official state insignia and using their badges, weapons and official boats and vehicles. (Doc. 1 at ¶ 74.)

Although pipeline opponents had permission from a co-owner to be on the Property, officers arrested and charged individual protestors who were near the construction site under La. R.S. 14:61. (Doc. 1 at ¶ 75.) At another construction site, off the Property, officers arrested individuals who were paddling navigable waters and charged them under La. R.S. 14:61. (Doc. 1 at ¶ 76.) The arrested individuals were handcuffed, placed in the parish jail and made to post bonds of up to $21,000. (Doc. 1 at ¶ 77.) Officers used tasers and pepper spray. (Doc. 1 at ¶ 78-79.) The District Attorney has not accepted charges for any of the arrests. (Doc. 1 at ¶ 80.)

e.  *Plaintiffs*

1.  <u>Arrestee Plaintiffs</u>

Plaintiffs Anne White Hat, Ramon Mejía, and Karen Savage, ("Arrestee Plaintiffs") have all been arrested and charged under La. R.S. 14:61 for unauthorized entry of critical infrastructure on the Property, where they had permission from co-owners to enter and remain, while the pipeline company was constructing illegally. (Doc. 1 at ¶¶ 85, 86.)

Anne White Hat ("White Hat") is Sicangu Lakota, and part of an indigenous led opposition to the Bayou Bridge Pipeline in Louisiana.  White Hat was arrested two weeks after the alleged unauthorized entry. (*Id.* at ¶ 87.) The affidavit for White Hat's arrest states:

 that for one of the charges under La. R.S. 14:61, she was "on the pipeline right of way" with approximately 30-35 other protesters. For the second charge under La. R.S. 14:61, the affidavit states that White Hat "started to walk back up the incline,"

which according to the affidavit was in the right of way, but then noted that she moved off the incline along with others after discussion with officers.

(*Id.* at ¶ 89.) "White Hat is currently facing the possibility of prosecution for the two felony charges that are subject to a combined 10 years imprisonment. The pending charges have affected her life and her ability to engage in further demonstrations against the Bayou Bridge pipeline and other petrochemical projects." (Doc. 1 at ¶ 19.)

Karen Savage ("Savage") is an investigative journalist and photojournalist who covers stories on criminal justice and the environment, and a resident of New York, New York. (Doc. 1 at ¶ 21.) Savage's arrest warrant stated that she "walked onto the top of the berm" and "was taking pictures." (*Id.* at ¶ 88.)

> Savage was arrested another time along with Ramon Mejía on August 18, 2018. According to the warrant affidavits, they were "standing beneath a 'tree house,'" in which a person was sitting in protest near the site. When Savage and Mejía allegedly remained where they were standing thirty minutes after being told to leave, they were arrested and charged with "Remaining After Being Forbidden" under La. R.S. 14:63, a misdemeanor. While transporting Savage and Mejia were being transported to the jail, (sic) the arresting officer stated that another officer had arrived on the scene and advised him that Savage, Mejía, and the other two people arrested had been in the right of way, after which they were also charged with felony unauthorized entry of a critical infrastructure under La. R.S. 14:61.

(*Id.* at ¶ 91.) "[Savage] now faces the possibility of prosecution and a combined 10 years imprisonment as well as heavy fines. The law, with its harsh penalties has impacted and chilled her ability to observe and report on events that are of great public concern." (*Id.* at ¶ 21.)

Roman Mejía ("Mejía") "is an eighth-grade social studies teacher and a founding member of #VetsVsHate, a national grassroots initiative founded by war veterans to overcome racism and bigotry, and resides in Biloxi, Mississippi." (Doc. 1 at ¶ 20.)

2.  Landowner Plaintiffs

Katherine Aaslestad, Peter Aaslestad, Theda Larson Wright, Alberta Larson Stevens, and Judith Larson Hernandez, ("Landowner Plaintiffs") own undivided interests in the Property. (*Id.*

at ¶ 23.) The Landowner Plaintiffs opposed the Bayou Bridge Pipeline because they were concerned about "the environment and health of communities that would be affected by the pipeline, damage to the Basin, effects on flood control, and coastal land loss in Louisiana, and the increasing threats posed by climate change." (*Id.*) The Landowner Plaintiffs were "distressed and upset" by the pipeline company's decision to begin construction without their consent and before commencing an expropriation proceeding (*Id.*) Also the Landowner Plaintiffs "grew even more concerned that people who were protesting the pipeline project on their property were being arrested and charged with felonies under the new law while the company was there illegally and urging the arrests." (*Id.*)

> All of the "Landowner Plaintiffs" are concerned that the new law makes it unclear where they can be present on their property and when, and who gets to decide. They are concerned that they and other landowners, and guests they allow onto their property, face the possibility of five years in prison if they run afoul of the law merely by being present on or in the vicinity of the pipeline on their property with no clear direction as to why, when, who decides, and how the law is to be applied.

(Doc. 1 at ¶ 25.)

Further the Landowner Plaintiffs "are concerned, however, about the vagueness of the law as it applies to their property and their rights as owners now that the pipeline company has an easement and right of way on their property, which was only granted by a Court after it found the company had committed trespass when it constructed its pipeline." (*Id.* at ¶ 96.) For example:

> Plaintiffs Wright, Stevens, and Hernandez have in the past expressly granted permission to peaceful non-violent protesters to be on their property to engage in and express their opposition to the project, and to monitor and document the company's illegal presence on and destruction of trees and land, which has been in their family for generations. They intend to continue to find ways to advocate for transition away from fossil fuels and toward a more just climate- and earth-centered approach to energy. They intend to continue to support Water Protectors and desire to exercise their rights of assembly and association. They may consider allowing guests, including journalists, back on their land for monitoring, evaluation, educational, and awareness-raising purposes.

(Doc. 1 at ¶ 95.)

3.  <u>Plaintiffs Lavigne and Joseph</u>

Sharon Lavigne lives and owns property in the Fifth District of St. James Parish, which is predominately African-American and heavily pervaded by petrochemical facilities. (Doc. 1 at ¶ 22.) "As a landowner with oil and gas exploration operations and potentially pipelines running through her property, Lavigne is concerned about the vagueness in the amended law as to its reach and scope and who gets to decide when she, her family, or guests can be on or near those parts of the property." (*Id.*)

> Lavigne is also founder and president of RISE St. James, a grassroots, faith-based organization dedicated to opposing the siting of new petrochemical facilities in the area out of concern for the worsening health effects and environmental pollution from industry in the area. In that capacity, she has organized marches, press conferences, and demonstrations, in the area and intends to continue to do so in St. James and elsewhere in the region known as "Cancer Alley," the 85-mile stretch between Baton Rouge and New Orleans heavily burdened by petrochemical facilities. Lavigne is concerned that the law will impact their ability to march and protest in areas where there are numerous pipelines.

(*Id.*) Harry Joseph is a resident of the Fifth District in St. James Parish, the pastor of Mount Triumph Baptist Church, and a member of RISE St. James. (Doc. 1 at ¶ 26.) Pastor Joseph is a community activist, and "[h]e is concerned that the new law will make it more difficult to organize and participate in marches and events expressing opposition to such projects, given the proliferation of pipelines in the community." (*Id.*) He is also "concerned how the law can be used to discourage and chill protest against, as well as observation and monitoring of, controversial petrochemical projects, given the proliferation of pipelines in the area." (Doc. 1 at ¶ 99.)

4.  <u>Environmental Justice Organizations</u>

"RISE St. James has organized press conferences, revivals, and marches to protest the permitting of new petrochemical facilities in the surrounding area, and intends to continue to do so." (Doc. 1 at ¶ 27.) Given that the petrochemical infrastructure, including pipelines, is so pervasive in St. James, and the 5th District in particular, RISE is concerned that the law could be

used against them to prevent or discourage their protests and public events held to raise awareness about the dangers of the projects to the communities that will be affected by them. (*Id.*)

350 New Orleans is a volunteer climate activist group, and registered non-profit organization, based in New Orleans that supports local initiatives connecting the issues in the region to international climate advocacy. (Doc. 1 at ¶ 28.) 350 New Orleans exercise their First Amendment rights to advocate and "have engaged in acts of civil disobedience and have incurred misdemeanor charges when protesting near or on pipeline construction sites." (*Id.*)

> They desire to continue protesting such projects as well as support communities where pipelines are likely present. Their work and political advocacy, however, are directly impacted by the amendment to La. R.S. 14:61 as it severely increases the punishment for presence on or near pipelines and chills their First Amendment expression of these views and deters others from joining their protests and demonstrations.

(*Id.*) Therefore, "Given the vagueness of the critical infrastructure law and the arbitrary and discriminatory way in which it has already been enforced, members are concerned that they do not have a way to know what conduct is prohibited and where, and what could subject them to a possible prison sentence of five years, along with the possibility of steep fines." (Doc. 1 at ¶ 104.)

"Local members intend to continue to advocate for climate justice and advocate, educate about and peacefully and non-violently protest environmental injustices in Louisiana, including opposition to pipeline projects." (Doc. 1 at ¶ 102.) "They are concerned that similar non-violent speech and expression could subject them to felony charges and harsh and lengthy sentences of imprisonment. This concern and the threat of felony prosecutions has had a chilling effect on their political speech and advocacy." (*Id.* at ¶ 103.)

"Louisiana Bucket Brigade ("Bucket Brigade") is a non-profit environmental health and justice organization based in New Orleans that works with communities in Louisiana located near oil refineries and chemical plants, which are often predominantly African-American communities." (Doc. 1 at ¶ 29.) Bucket Brigade members and staff "frequently exercise their First Amendment rights." (*Id.*) "Bucket Brigade staff also reported live and frequently filmed activities in the area, interviews with experts, community members, and activists, at or near pipeline construction sites and have been at times threatened by pipeline construction workers and/or security personnel." (*Id.*)

> Their work and political advocacy are directly impacted and chilled by the amendment to La. R.S. 14:61 as it severely increases the punishment for remaining on or, possibly near, pipelines and its members are concerned about the possibility of arrests and felony charges, not only for their protest and expressive conduct but also for their work monitoring and documenting violations.

 (*Id.* at ¶ 108.)

## APPLICABLE STANDARD

*a.  Rule 12(b)(3)*

The Fifth Circuit has explained. "On a Rule 12(b)(3) motion to dismiss for improper venue, the court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007) (citing *see, e.g.*, *Murphy v. Schneider Nat'l, Inc.,* 362 F.3d 1133, 1138 (9th Cir.2004); 5B C. Wright, A. Miller, E. Cooper, & R. Freer, Federal Practice and Procedure § 1352 (3d ed.).

Wright & Miller outlines:

> Practice on a motion under Rule 12(b)(3) is relatively straight-forward. All well-pleaded allegations in the complaint bearing on the venue question generally are taken as true, unless contradicted by the defendant's affidavits. A district court may examine facts outside the complaint to determine whether its venue is proper. And, as is consistent with practice in other contexts, such as construing the complaint, the court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff.

5B C. Wright, A. Miller, E. Cooper, & R. Freer, Federal Practice and Procedure § 1352 (3d ed.);

*see Audubon Real Estate Assocs., L.L.C. v. Audubon Realty, L.L.C.*, No. CIV.A. 15-115-SDD,

2015 WL 4094235, at *3 (M.D. La. July 7, 2015) ("On a Rule 12(b)(3) motion to dismiss for

improper venue, the court must accept as true all allegations in the complaint and resolve all

conflicts in favor of the plaintiff. The court may look outside of the complaint and its

attachments and review the complaint supplemented by the undisputed facts evidenced in the

record or by undisputed facts plus the court's resolution of disputed facts.") (internal footnotes

and quotations omitted).

<u>DISCUSSION</u>

*a. Parties' arguments*

   1. <u>Defendants' arguments in support</u>

      A. <u>*The Attorney General was improperly joined such that venue does not lie in the Middle District*</u>

The Attorney General argues that as he is only named as a defendant in his official

capacity, the suit "is not a suit against the official but rather a suit against the official's office."

(Doc. 30-1 at 5 (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).) Therefore,

the Attorney General maintains that the suit "is no different from a suit against the State itself"

and barred by sovereign immunity. (*Id.*) In this case, the Attorney General maintains that

Louisiana has not waived sovereign immunity nor was sovereign immunity abrogated by § 1983.

(Doc. 30-1 at 5 (citing *Champagne v. Jefferson Parish Sheriff's Office*, 188 F.3d 312, 314 (5th

Cir. 1999)).)

The Attorney General argues that because sovereign immunity has not been waived, *Ex*

*Parte Young*, 209 U.S. 123, 155-56 (1908) provides the only means by which Plaintiffs could

seek prospective injunctive relief against state officials. (Doc. 30-1 at 5.) Applying the *Ex Parte Young* exception, the Attorney General argues that

> Plaintiffs plead no specific acts by Attorney General Landry, but point to Article 62 of the Louisiana Code of Criminal Procedure as providing the Attorney General with authority to "exercise[] supervision over all district attorneys in the state" and "institute a prosecution . . . for the assertion or protection of the rights and interests of the State."

(Doc. 30-1 at 6 (citing Doc. 1 at ¶ 30.) The Attorney General points out that Article 62 of the Louisiana Code of Criminal Procedure is limited by the Louisiana Constitution. Specifically, that although Article V Section 26(B) provides that a district attorney "shall have charge of every criminal prosecution by the state in his district," Article IV Section 8 provides that "the Attorney General's authority 'to institute, prosecute, or intervene in any criminal action' can be exercised only 'for cause, when authorized by the court which would have original jurisdiction' over the prosecution." (Doc. 30-1 at 6). Therefore, the Attorney General maintains that "the Louisiana Constitution makes 'any involvement the Attorney General might have in prosecuting cases under the statute . . . indirect and remote.'" (Doc. 30-1 at 7 (citing *Doe v. Jindal*, No. 11-554-BAJ-SCR, 2011 U.S. Dist. LEXIS 93094, at *8 (M.D. La. Aug. 19, 2011) (quoting *Entm't Software Ass'n v. Foti*, 451 F. Supp. 2d 823, 828 (M.D. La. 2006))).)

Under Article IV, Section 8's limitation of authority, Attorney General argues that Plaintiffs must plead facts suggesting good cause for the Attorney General to prosecute them or show that a court has authorized the Attorney General to do so. (*Id.* at 7.) Attorney General maintains that no such authorization has been sought, nor have Plaintiffs alleged facts to suggest that there is good cause for the Attorney General to prosecute Plaintiffs. (*Id.* at 7.) Therefore, Attorney General argues that as a matter of law he is entitled to be dismissed as a party defendant. (*Id.* at 7.)

14

Attorney General argues that if he is dismissed as a party defendant, then the Middle District of Louisiana is no longer a proper venue under 28 U.S.C. § 1391(b)(1), because neither of the remaining Defendants resides in the Middle District. (Doc. 30-1 at 7 (citing *see, e.g., Leroy*, 443 U.S. at 179; *Perez*, 1995 U.S. App. LEXIS 41289 at *7 (noting impact of dismissal of one defendant on venue).) Attorney General also argues that venue is not proper under 28 U.S.C. § 1391(b)(2) because the events that gave rise to Plaintiffs' claims occurred in St. Martin Parish in the Western District of Louisiana. (Doc. 30-1 at 7.)

The District Attorney echoes that venue is not proper in the Middle District of Louisiana because: (1) the District Attorney conducts his official duties in the Western District; (2) the arrests occurred in the Western District; (3) Plaintiffs do not reside in the Middle District; (4) only the Attorney General has ties to the Middle District. (Doc. 32-1 at 10.) If the Court does not dismiss the District Attorney, he requests that the case be transferred to the United States District Court for the Western District of Louisiana under 28 U.S.C. § 1404(a) and § 1406.

The Sheriff repeats that venue is not appropriate in the Middle District because the only defendant who resides the Middle District is the Attorney General, and he is not a proper defendant. Further, the Sheriff argues that the Complaint does not show that the Attorney General played any part in the events at issue in the suit or that the Attorney General has taken any interest in the cases of the Arrestee Plaintiffs. (Doc. 31-1 at 3.) Further, the Sheriff maintains "all the protests, trespasses, and arrests Plaintiffs describe took place in St. Martin Parish, which is in the Western District." (Doc. 31-1 at 1-2.)

2. Plaintiffs' response

    A. *The Attorney General is a proper party under Ex Parte Young*

Plaintiffs argue that the Attorney General is a proper party under the Louisiana Constitution because he has a clear and sufficient connection to the enforcement of the statute.

15

(Doc. 34 at 4.) Plaintiffs maintain that the Attorney General's connection arises from his "authority to prosecute criminal cases directly in some circumstances and supervisory authority of district attorneys who wield that authority." (*Id.*) Plaintiffs point to the fact that the Louisiana Constitution of 1974 makes the Attorney General,

> the chief legal officer of the state with authority to advise and assist in the prosecution of any criminal case at the request of district attorneys in the state, and to institute, prosecute, or intervene in any criminal action or proceeding, or supersede any attorney representing the state in any civil or criminal action, for cause and with judicial authorization.

(Doc. 34 at 4-5.) In addition, Plaintiffs cite the Louisiana Code of Criminal Procedure, Article 62 that states "the attorney general shall exercise supervision over all district attorneys in the state." (Doc. 34 at 5.)

Plaintiffs highlight that the Attorney General has previously declared it would "vigorously defend" this litigation because the "state has an obvious and compelling reason to protect vital infrastructure from criminal trespass, damage, or possible attack." (Doc. 34 at 5 (citing *The Latest: Attorney General Backs Pipeline Trespass Law,* Associated Press, May 22, 2019, *available at* https://www.usnews.com/news/best-states/louisiana/articles/2019-05-22/the-latest-attorney-general-backs-pipelinetrespass-law.).) In addition, Plaintiffs argue that the Attorney General has previously intervened in cases challenging the constitutionality of a state law in order to protect the state's interest. (Doc. 34 at 6.) Therefore, Plaintiffs maintain that the Attorney General is connected to this case under *Ex Parte Young* and a proper party in this case.

> ### B. *Plaintiffs' chosen venue is proper and should be maintained*

Because the Attorney General is a proper party in this case, and the Attorney General's residence is where he performs his official duties, Plaintiffs maintain that their chosen venue is proper under 28 U.S.C. § 1391(b)(1) and should not be changed. (Doc. 34 at 6 (citing *Fla.*

*Nursing Home Ass'n v. Page,* 616 F.2d 1355, 1360 (5th Cir. 1980), *rev'd on other grounds, Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147 (1981)).)

Plaintiffs also argue that venue is appropriate under 28 U.S.C. § 1391(b)(2) because the statute challenged as unconstitutional was passed in the Middle District. (Doc. 34 at 10.) Under state law, cases challenging the constitutionality of a law are required to be brought in East Baton Rouge Parish. (Doc. 34 at 7 (citing *Devillier v. State,* 590 So.2d 1184 (La. 1991)).) Plaintiffs argue that federal courts take a consistent approach by focusing on the decision-making process rather where the claim occurred. (Doc. 34 at 7 (citing *see e.g., Nat'l Ass'n of Home Builders v. U.S. E.P.A.*, 675 F. Supp. 2d 173, 179 (D.D.C. 2009); *Greater Yellowstone Coalition v. Bosworth,* 180 F. Supp. 2d 124, 128-130 (D.D.C. 2001); *Akiachak Native Cmty. v. Dep't of Interior,* 502 F. Supp. 2d 64, 67-68 (D.D.C. 2007)).)

C. *The case should not be transferred under 28 U.S.C. § 1404(a)*

Plaintiffs urge that the matter should not be transferred to the United States District Court for the Western District of Louisiana under 28 U.S.C. § 1404(a). (Doc. 34 at 8.) Plaintiffs maintain that the balance of considerations weigh in favor of maintaining venue in this district because Defendants did not clearly demonstrate that a transfer is for the convenience of parties and witnesses and in the interest of justice. (Doc. 34 at 8 (citing *In re Volkswagen of Am., Inc.,* 545 F.3d 304, 315 (5th Cir. 2008)).) Under the *Volkswagen* factors, Plaintiffs urge that the Middle District is the most convenient venue because the in-state Plaintiffs reside in the Eastern District. (Doc. 34 at 9.)  Further, Plaintiffs argue that Defendants have failed to argue any facts regarding the first, third, or fourth factors. (*Id.*) Plaintiffs also disagree that this predominately affects St. Martin Parish because finding the statute unconstitutional would have statewide effects. (*Id.*)

3. Defendants' reply

A.  *The Attorney General's defense of state statutes does not make him a proper party under Ex Parte Young*

The Attorney General reiterates that Plaintiffs have failed to offer argument or allegations to show that the Attorney General has either "cause" or has been "authorized by [a] court which would have original jurisdiction" to exercise prosecutorial authority under the Louisiana Constitution. (Doc. 40 at 1 (citing La. Const. art. IV, Section 8.) The Attorney General asserts that as Plaintiffs argue the Attorney General has an obligation to defend the state in litigation, that obligation does not trigger the *Ex Parte Young* exception to sovereign immunity. (*Id.* (citing *Ex Parte Young*, 209 U.S. 123, 157 (1909)).) The Attorney General directs the Court to the result reached in *June Medical Services v. Caldwell*, No. 3:14-cv-525-JWD-RLB, 2014 WL 4296679 (M.D. La. Aug. 31, 2014), where this Court held that it lacked jurisdiction because the Attorney General lacked the power to enforce the act and dismissed him as a defendant. (Doc. 40 at 2 (citing *June Medical*, at *3 and n.8.) The Sheriff and the District Attorney agree that the Attorney General is not a proper Defendant, even if he could potentially intervene to defend the constitutionality of the law. (Doc. 39 at 2; Doc. 41 at 2.)

The Attorney General maintains that there is no dispute that if the Attorney General is dismissed, venue is not proper under 28 U.S.C. § 1392(b)(1). (Doc. 40 at 2.) Under 28 U.S.C. § 1391(b)(2), the Attorney General argues that an enactment of a criminal law does not give rise to a cognizable claim but rather that the claim arises upon a threat of prosecution. (*Id.* (citing *Younger v. Harris*, 401 U.S. 37, 42 (1971); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562, 573-74 (1992)).) Distinguishing the cases relied upon by Plaintiffs, the Attorney General points out that a challenge to the constitutionality of a state statute as applied is different than a procedural challenge as to the decision making in enacting the law. (*Id.* at n.1.) The Sheriff agrees that more than passage of an act is required to give rise to a claim. (Doc. 39 at 3.)

The District Attorney argues that transfer is appropriate under 28 U.S.C. § 1404(a) because it would be more convenient for the parties and otherwise promote the interest of justice. (Doc. 41 at 2.) The District Attorney contends that the factors weigh in favor of transfer because the Attorney General is the only party located in the Middle District and he is not a proper party, the District Attorney and the Sheriff are located in the Western District, the non-Arrestee Plaintiffs have no standing, the Arrestee Plaintiffs' conduct occurred in the Western District, and the alleged arrests occurred in the Western District. (Doc. 41 at 3.)

*b. Analysis*

1. Whether the Attorney General is a proper defendant to this action under *Ex Parte Young*

Defendants argue that because the Attorney General is sued in his official capacity and Louisiana has not waived sovereign immunity, the only manner in which Plaintiffs may seek prospective injunctive relief against an official is under *Ex Parte Young*. Plaintiffs respond that they have alleged sufficient facts to show the *Ex Parte Young* exception applies to the Attorney General. The Court agrees with Defendants.

"The Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest. Thus, [t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Id.* at 465 U.S. at 101, 104 S. Ct. at 908. (citations and quotations omitted). Accordingly, "[t]he Eleventh Amendment bars claims against a state brought pursuant to 42 U.S.C. § 1983." *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998) (citing *Farias v. Bexar Cty. Bd. of Trustees for Mental Health Mental Retardation Servs.*, 925 F.2d 866, 875 n.9 (5th Cir. 1991) ). "Section 1983 does not waive the states' sovereign immunity[.]" *Id.* (citing *Quern v. Jordan*, 440 U.S. 332, 338 n.7, 99 S. Ct. 1139, 59 L.Ed. 2d 358 (1979) ).

Nevertheless, "[i]n *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court carved out an exception to Eleventh Amendment immunity." *Aguilar*, 160 F.3d at 1054. "The [*Ex Parte Young*] Court held that enforcement of an unconstitutional law is not an official act because a state can not confer authority on its officers to violate the Constitution or federal law." *Id.* (citing *American Bank & Trust Co. of Opelousas v. Dent*, 982 F.2d 917, 920–21 (5th Cir. 1993)). "To meet the *Ex Parte Young* exception, a plaintiff's suit alleging a violation of federal law must be brought against individual persons in their official capacities as agents of the state, and the relief sought must be declaratory or injunctive in nature and prospective in effect." *Id.* (citing *Saltz v. Tenn. Dep't of Emp't Sec.*, 976 F.2d 966, 968 (5th Cir. 1992)).

Phrased another way, "[i]n determining whether the doctrine of *Ex Parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (quoting *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). Further for the *Ex Parte Young* doctrine to apply, the official must have "some connection" to the enforcement of the act at issue. *Ex Parte Young*, 209 U.S. 123, 157 (1908) ("[I]t is plain that such officer must have some connection with the enforcement of the act."); *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) ("[W]e recognize that this circuit's caselaw requires some scintilla of 'enforcement' by the relevant state official with respect to the challenged law."). Therefore, "[w]hile enforcement power may be 'found implicitly' in state law other than the challenged statute, it may not be implied from the Attorney General's general duty to faithfully execute state law." *Entm't Software Ass'n v. Foti*, 451 F. Supp. 2d 823, 827 (M.D. La.

2006).

The *Complaint* alleges:

> Defendant Jeff Landry . . .  exercises supervision over all district attorneys in the state and has authority to institute a prosecution as he may deem necessary for the assertion or protection of the rights and interests of the state, pursuant to La.C.Cr.P. Art. 62. As such Landry wields authority over criminal justice policy in Louisiana including the enforcement of La. R.S. 14:61 prohibiting unauthorized entry of critical infrastructure . . .

(Doc. 1 at ¶ 30.) Plaintiffs argue that the as the "chief legal officer" of Louisiana, the Attorney General has the "authority to advise and assist in the prosecution of any criminal case at the request of district attorneys in the state, and to institute, prosecute, or intervene in any criminal action or proceeding, or supersede any attorney representing the state in any civil or criminal action, for cause and with judicial authorization." (Doc. 34 at 4-5.) The Attorney General argues that his authority to prosecute criminal cases is limited by the terms of article IV Section 8 of the Louisiana Constitution. The Court agrees with the Attorney General.

Article IV, Section 8 of the Louisiana Constitution states:

> Section 8. There shall be a Department of Justice, headed by the attorney general, who shall be the chief legal officer of the state. The attorney general shall be elected for a term of four years at the state general election. The assistant attorneys general shall be appointed by the attorney general to serve at his pleasure.
>
> As necessary for the assertion or protection of any right or interest of the state, the attorney general shall have authority (1) to institute, prosecute, or intervene in any civil action or proceeding; (2) upon the written request of a district attorney, to advise and assist in the prosecution of any criminal case; and (3) for cause, when authorized by the court which would have original jurisdiction and subject to judicial review, (a) to institute, prosecute, or intervene in any criminal action or proceeding, or (b) to supersede any attorney representing the state in any civil or criminal action.
>
> The attorney general shall exercise other powers and perform other duties authorized by this constitution or by law.

La. Const. Ann. art. IV, § 8. Therefore, the Attorney General only has the authority to advise and assist in the prosecution of a criminal case upon request of a district attorney, and/or when

authorized for cause by a court which would have original jurisdiction. In contrast, under article V Section 26 of the Louisiana Constitution, a district attorney, elected by the individuals in the judicial district for a term of six years, " . . . shall have charge of every criminal prosecution by the state in his district, be the representative of the state before the grand jury in his district, and be the legal advisor to the grand jury. He shall perform other duties provided by law." La. Const. Ann. art. V, § 26.

In examining whether the Attorney General of Louisiana was a proper defendant under *Ex Parte Young*, the Honorable Brian Jackson of this Court explained that although the attorney general of Louisiana is responsible for enforcement of the state's laws,

> Unlike district attorneys, [the attorney general of Louisiana] does not have original jurisdiction to prosecute criminal cases. He may assist in a criminal prosecution "upon written request of a district attorney." La. Const. Art. 4, § 8. Alternatively, he may institute, prosecute or intervene in a criminal case "for cause, when authorized by the court" having original jurisdiction. *Id.* Consequently, any involvement the Attorney General might have in prosecuting cases under the statute is indirect and remote.

*Doe v. Jindal*, No. CIV.A. 11-554-BAJ, 2011 WL 3664496, at *3 (M.D. La. Aug. 19, 2011) (quoting *Entm't Software Ass'n.,* 451 F. Supp. at 828); *see Robicheaux v. Caldwell*, 986 F. Supp. 2d 749, 752 (E.D. La. 2013) ("The Attorney General's sweeping responsibility to enforce the laws of the State of Louisiana lacks the *Ex Parte Young* specificity nexus between the Attorney General and the alleged unconstitutional provisions that is essential to defeat sovereign immunity.").

The Court agrees that absent some showing that the Attorney General has been asked to assist in the criminal prosecution of the Statute, or has instituted, prosecuted, or intervened for cause when authorized by a court having original jurisdiction over the criminal prosecution, the general obligation of the Attorney General as the chief legal officer of Louisiana in prosecuting cases under the statute is indirect and remote. Therefore, the Court finds that because Plaintiffs

have not alleged sufficient facts to show that the Attorney General has more than a scintilla of a

connection with the enforcement of or prosecution under La. R.S. 14:61, the Attorney General is

not a proper defendant under the *Ex Parte Young* exception to sovereign immunity.[1] The Court

will therefore dismiss the claims against the Attorney General.

   2.   <u>Whether venue is appropriate in the Middle District</u>

  Having dismissed the claims against the Attorney General, the Court now turns to

whether venue is appropriate under either 28 U.S.C. § 1391(b)(1) or § 1391(b)(2). 28 U.S.C. §

1391(b)(1) states:

> (b) Venue in general.--A civil action may be brought in-- (1) a judicial district in
> which any defendant resides, if all defendants are residents of the State in which
> the district is located;

The Attorney General is the only defendant who resides in the Middle District, the District

Attorney and the Sheriff both reside in St. Martin Parish, which is in the Western District. (Doc.

30-1 at 7.) As the claims against the Attorney General have been dismissed, venue is no longer

proper in the Middle District under § 1391(b)(1).

  Plaintiffs also allege that venue is proper in the Middle District under § 1391(b)(2). 28

U.S.C. 1391(b)(2) states:

> (b) Venue in general.--A civil action may be brought in-- . . . (2) a judicial district
> in which a substantial part of the events or omissions giving rise to the claim
> occurred, or a substantial part of property that is the subject of the action is situated;

---

[1] Plaintiffs' argument that the Attorney General is a proper defendant under *Ex Parte Young* because he has
previously intervened in actions to defend the constitutionality of a state law in a civil suit, conflates the broad
authority of the attorney general of the state of Louisiana "to institute, prosecute, or intervene in any civil action or
proceeding" and the duty to defend the constitutionality of a state law, with the more limited authority that the
attorney general has in a criminal proceeding. The relevant inquiry under *Ex Parte Young* is not whether the attorney
general can intervene in this civil proceeding but rather whether the attorney general has a connection to the
enforcement of the statute. *See June Med. Servs., LLC v. Caldwell*, No. 3:14-CV-00525-JWD, 2014 WL 4296679, at
*3 (M.D. La. Aug. 31, 2014).

28 U.S.C. § 1391(b). The Fifth Circuit's leading case on this issue establishes that § 1391 controls a Plaintiff's choice of venue "when no special, restrictive statute applies." *Volkswagen II*, 545 F.3d at 312. Under § 1391(b)(2), "Although the chosen venue does not have to be the place where the most relevant events took place, the selected district's contacts still must be substantial." *McClintock v. Sch. Bd. E. Feliciana Parish,* 299 F. App'x. 363, 365 (5th Cir. 2008); *accord Audubon Real Estate Assocs., LLC v. Audubon Realty, LLC*, No. 14-115, 2015 U.S. Dist. LEXIS 87758, at *9-10, 2015 WL 4094235, at *3 (M.D. La. July 7, 2015). Based on the relevant jurisprudence, "[c]ourts have generally held the 'substantial parts of events' inquiry is resolved by looking to the locale of alleged acts or omissions." *Audubon Real Estate Assocs., LLC*, 2015 U.S. Dist. LEXIS 87758, at *10, 2015 WL 4094235, at *3.

The *Complaint* states, "Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to Plaintiffs' claims occurred in this district." (Doc. 1 at ¶ 18.) Plaintiffs argue that the substantial portion of the events giving rise to Plaintiffs' claims that occurred in the Middle District was the 2018 passage of La. R.S. 14:61 into law through the Louisiana legislature. (Doc. 34 at 8.)

Plaintiffs direct the Court to *Devillier v. State*, 590 So. 2d 1184, 1184 (La. 1991) as support for their argument that under Louisiana law, the passage of an unconstitutional law is a substantial event that gives rise to a claim that the statute is unconstitutional. (*Id.* at 7.) The Court does not read *Devillier* so broadly. The Louisiana Supreme Court in *Devillier* explained that "[a]n action to prohibit a state agency from assessing a statutory fine based on the unconstitutionality of the statute must be brought in East Baton Rouge Parish." *Id.* Given that the state agency with the decision-making authority, and regulatory scheme were based in East

Baton Rouge Parish, the Louisiana Supreme Court concluded that the cause of action must be brought in East Baton Rouge Parish.

Plaintiffs also direct the Court to three decisions by the United States District Court for the District of Columbia for the proposition that federal courts look at where the decision-making process occurred when examining venue under 28 U.S.C. § 1391(b)(2). (Doc. 34 at 7 (citing *Nat'l Ass'n of Home Builders v. U.S. E.P.A*., 675 F. Supp. 2d 173, 179 (D.D.C. 2009); *Greater Yellowstone Coalition v. Bosworth,* 180 F. Supp. 2d 124, 128-130 (D.D.C. 2001); *Akiachak Native Cmty. v. Dep't of Interior,* 502 F. Supp. 2d 64, 67-68 (D.D.C. 2007)).) As Defendants point out, each of these cases challenged an agency's decision-making process under the Administrative Procedure Act ("APA"). As the District Court for the District of Columbia explained, "[i]n cases brought under the APA, courts generally focus on where the decision-making process occurred to determine where the claims arise." *Nat'l Ass'n of Home Builders v. U.S. E.P.A.*, 675 F. Supp. 2d 173, 179 (D.D.C. 2009). However, as this case does not arise under the APA, nor does it challenge agency decision-making at the state or federal level, Plaintiffs cases are not persuasive.

As the Honorable Judge Jackson of this Court explained when considering whether a substantial portion of events giving rise to plaintiff's claims occurred in the forum:

> "'[S]ubstantiality' for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiffs claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." *Univ. Rehab. Hosp., Inc. v. Int'l Co-op. Consultants, Inc.,* No. 05–1827, 2006 WL 1098905 (W.D. La. Apr. 24, 2006) (quoting *Daniel v. Am. Bd. of Emergency Med.,* 428 F.3d 408, 432–33 (2d Cir. 2005)). Further, several courts have held that the "focus of the 'substantial part of events' inquiry is on the actions or omissions of the defendant." *E.g., Gray Cas. & Sur. Co. v. Lebas,* No. 12–2709, 2013 WL 74351 (E.D. La. Jan. 7, 2013) (citations omitted).

*Vivint Louisiana, LLC v. City of Shreveport*, No. CIV.A. 14-00617-BAJ, 2015 WL 1456216, at *2 (M.D. La. Mar. 23, 2015).

Plaintiffs, in this case, bring a facial challenge to La. R.S. 14:61, namely that the Statute is unconstitutionally vague and viewpoint discriminatory, as well as an as applied challenge to La. R.S. 14:61 based on the events that occurred in St. Martin Parish. Courts are split as to whether venue is appropriate in the district of the state capital when a plaintiff makes a facial challenge to the constitutionality of a statute. As one court explained:

> Several courts apply the principle that "where plaintiffs challenge state-wide policies, and not merely the actions of state officials in a single county, venue is proper pursuant to Section 1391(b)(2) in the district where those policies are developed." *Chester v. Beard*, No. CIV.A. 07-4742, 2008 WL 2310946, at *8 (E.D. Pa. June 2, 2008). Other courts apply the venue statute more broadly. *See, e.g., Cent. Valley Chrysler-Jeep, Inc. v. Witherspoon*, No. CV-F-04-6663 REC, 2005 WL 2709508, at *6 (E.D. Cal. Oct. 20, 2005) ("In cases involving state officials, a substantial connection to the claim occurs not only where the 'triggering event' takes place, but also where the effects of the decision are felt.") (*citing McClure v. Manchin*, 301 F. Supp. 2d 564, 569 (N.D. W. Va. 2003) (rejecting secretary of state's claim that a state election law challenge must be brought in the district where the state government sits); *Emison v. Catalano*, 951 F. Supp. 714, 721 (E.D. Pa. 1996) (suits challenging official acts may be brought in the district where the effects of the challenged statute are brought despite being enacted elsewhere)). *See also Bay Cnty. Democratic Party v. Land*, 340 F. Supp. 2d 802, 806 (E.D. Mich. 2004) (finding that because the effects of the challenged election ballot procedure were felt statewide, venue was appropriate outside the district where state government was seated).

*Ansley v. Warren*, 2016 WL 5213937, at *8 (W.D. N.C. Sept. 20, 2016), *aff'd,* 861 F.3d 512 (4th Cir. 2017); *see Adams Outdoor Advert. Ltd. P'ship v. Pennsylvania Dep't of Transportation*, 307 F. Supp. 3d 380, 396 (E.D. Pa.), *reconsideration denied,* 321 F. Supp. 3d 526 (E.D. Pa. 2018), *aff'd in part, rev'd in part and remanded sub nom. Adams Outdoor Advert. Ltd. P'ship by Adams Outdoor GP, LLC v. Pennsylvania Dep't of Transportation*, 930 F.3d 199 (3d Cir. 2019), and *aff'd sub nom. Adams Outdoor Advert. Ltd. P'ship by Adams Outdoor GP, LLC v. Pennsylvania Dep't of Transportation*, 930 F.3d 199 (3d Cir. 2019) ("To the extent that Adams challenges the constitutionality of the Act itself, a substantial portion of the events took place in the Middle District of Pennsylvania where the law was enacted."); *Farmland Dairies v.*

*McGuire*, 771 F. Supp. 80, 82 (S.D. N.Y. 1991) (rejecting the argument that the enactment of the statute was a substantial part of the events giving rise to the claim, where distribution of product at issue occurred in a different district.). *Seariver Mar. Fin. Holdings, Inc. v. Pena*, 952 F. Supp. 455, 460 (S.D. Tex. 1996) ("The Southern District of New York, in evaluating an action for declaratory judgment and injunctive relief concerning a New York state regulation imposing compensatory payments on milk produced outside the state of New York, held that venue was proper in the Southern District of New York, where most of the milk in question was sold.  The Court stated that it was the "'distribution' of milk in the state of New York which trigger[ed] compensatory payments," and therefore this distribution was a "substantial part of the events giving rise to the claim." The Court specifically rejected the defendant's argument that a "substantial part of the events" was established by either the enactment in Albany of statutes and orders establishing the system of compensatory payments, or by the plaintiffs' marketing and distribution decisions in other states. Similarly, this Court is not persuaded by Plaintiffs' analogous arguments that venue may be laid in this district because their decisions concerning the vessel are made here."); *Sheffield v. State of Tex.*, 411 F. Supp. 709, 713–14 (N.D. Tex. 1976) ("The State argues that because the statute was passed and signed into law in Austin; the value data compiled and transmitted in Austin; and, the Commissioner of Education, Governor and review panel refused to equalize market evaluation in Austin, the claim therefore arose in that district. But the effect of the statute's passage and administration has been clearly felt in the Northern District. . . Our analysis is bottomed upon our conclusion that the injury alleged in this case has or will occur in the Northern District.")

The Court concludes that although venue is proper in the Western District (the *Complaint* alleges that the arrests of the Arrestee Plaintiffs and the Landowner Plaintiffs' alleged injury

occurred in St. Martin Parish), venue is also proper in the Middle District given that Plaintiffs bring a facial challenge to the constitutionality of the Statute that was debated and enacted in the Middle District. The passage of the La. R.S. 14:61 constitutes a substantial part of the events giving rise to the claim that the Statute is unconstitutionally vague and viewpoint discriminatory. Therefore, the Court determines that venue is appropriate in the Middle District under § 1391(b)(2).

The Court agrees that when challenging the constitutionality of a state statute, venue is proper in the state capitol, where the law was passed.

3. Whether the case should be transferred to the Western District under 28 U.S.C. 1404(a)

That venue is proper in the Middle District under § 1391(b)(2), of course, does not end the Court's inquiry. The federal venue transfer statute provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought[.]" 28 U.S.C. § 1404(a).

Because the Sheriff and the District Attorney reside in St. Martin Parish, which is located in the Western District of Louisiana, and "a substantial part of the events or omissions giving rise" to Plaintiffs' suit occurred there, venue in the Western District is also proper. Under § 1404(a), a motion to transfer venue should be granted if "the movant demonstrates that the transferee venue is clearly more convenient." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) ("*Volkswagen II*"). While deference is given to the plaintiff's choice of venue, a movant need only show "good cause" to prevail on a motion to transfer. *Id.* That is, the movant must "satisfy the statutory requirements and clearly demonstrate that a transfer" meets the § 1404 threshold of convenience and serves the interest of justice. *Id.*

In the Fifth Circuit, courts apply a host of public and private interest factors established by the Supreme Court in *Gulf Oil Corporation v. Gilbert*, 330 U.S. 501 (1947), to determine

"whether a § 1404(a) venue transfer is for the convenience of parties and witnesses and in the interest of justice." *Volkswagen II*, 545 F.3d at 315. The private interest factors include: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*"). The public interest factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or] the application of foreign law." *Id.* While they illuminate the convenience inquiry, these factors "are not necessarily exhaustive or exclusive," and "none can be said to be of dispositive weight." *Volkswagen II*, 545 F.3d at 315 (internal quotation marks omitted).

For the reasons explained below there is good cause to transfer this action to the Western District of Louisiana.

### A. *Private Interest Factors*

When applied to Plaintiffs' factual allegations, the *Volkswagen* factors point inexorably to the Western District of Louisiana as the more convenient forum for this lawsuit.

#### i. Ease of Access to Sources of Proof

While access to certain sources of proof as a factor may not have the import it used to, the Fifth Circuit has reminded courts that it remains a "meaningful factor" in the § 1404(a) analysis. *Volkswagen II*, 545 F.3d at 316. Plaintiffs' suit arises out of activities occurring in St. Martin Parish, including the construction of the Bayou Bridge Pipeline, the arrests of the Arrestee Plaintiffs, and the ongoing advocacy for environmental justice in that Parish. Sources of proof outside of the Western District are limited to the Plaintiffs who reside outside of the

Western District or outside of Louisiana. Defendants and their witness, documents, and physical evidence are predominately located at the District Attorney and the Sheriff's offices in the St. Martin Parish.

The Court concludes that this factor weighs in favor of transfer.  Based on the allegations in the *Complaint*, the sources of proof at trial—witnesses, documents, and physical evidence—are predominantly or located in the Western District. *See, e.g.*, *Volkswagen II*, 545 F.3d at 316 (finding this factor weighed in favor of transfer to a different division where "[a]ll of the documents and physical evidence" related to the accident at issue were located in the [transferee division]").  Although Plaintiffs argue that potential witnesses may need to travel from the Eastern District, without any showing that any records, evidence, or witnesses are in the Middle District, the Court concludes that the access-to-proof factor weighs in favor of a transfer to the Western District.

### ii.  Securing Attendance of Witnesses

This factor is neutral because of the Western District and Middle District's coextensive subpoena power over witnesses located either in Baton Rouge or Lafayette. *See* Fed. R. Civ. P. 45(c)(1)(A) ("A subpoena may command a person to attend a trial, hearing or deposition . . . within 100 miles of where the person resides, is employed, or regularly transacts business in person[.]").

### iii.  Witnesses' Cost of Attendance

 Plaintiffs in this case reside in Louisiana (including St. James Parish and New Orleans), New York, Mississippi, West Virginia, Virginia, and New Mexico. Defendants are located in St. Martin Parish. The arresting officers work in St. Martin Parish. Although the Court is aware that some of the in-state Plaintiffs may have to travel from the New Orleans to Lafayette, that does

not preclude the conclusion that overall, it would be more convenient for in state witnesses to attend court proceedings in the Western District at the Lafayette courthouse. There is an importance and purpose of geographical boundaries for federal district courts as well as one of the public interest factors—"the local interest in having localized controversies decided at home." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 62 n.6 (2013) (internal quotation marks omitted).

"Additional distance means additional travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which these fact witnesses must be away from their regular employment." *Volkswagen I*, 371 F.3d at 205. While Lafayette and Baton Rouge are admittedly within relatively close proximity, they sit in different federal districts for a reason. Accordingly, the Court finds the cost-to-witnesses factor weighs in favor of transfer to the Western District of Louisiana. *See, e.g.*, *Frederick v. Advanced Fin. Sols., Inc.*, 558 F. Supp. 2d 699, 704 (E.D. Tex. 2007) ("When nearly all of the nonparty witnesses that will testify concerning disputed issues reside elsewhere, this factor weighs in favor of transferring the case.").

iv.  Other Practical Considerations

The final private interest factor asks for an examination into "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Volkswagen I*, 371 F.3d at 203. The Court notes that while the other private interest factors take into account the specific concerns about evidence and witnesses, this final factor considers similar but unarticulated matters which support this Court's conclusion that conducting this case in the Western District would be easier, more expeditions and less expensive.

B. *Public Interest Factors*

    i.  Court Congestion

The Middle District labors under a high case load and a heavily congested docket. In fact, it was named the fourth busiest district in the United States based on "weighted filings." *Middle District of Louisiana is Nation's 3rd Most Productive U.S. District Court*, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA, https://www.lamd.uscourts.gov/news/middle-district-louisiana-3rd-most-productive-us-district-court-feb2019 (last visited July 13, 2020). Accordingly, the Court finds that trying the suit in the Middle District would be less burdensome to the Court in the Western District than in this District. Thus, this factor favors transfer.

    ii.  Local Interests

The Court concludes that a Western District jury has a greater local interest in deciding this case because the suit arises out of arrests and environmental justice advocacy actions in the Western District.

Further, Plaintiffs have made no showing that the environmental justice advocacy regarding the Bayou Bridge Pipeline, or Louisiana Revised Statute 14:61 have impacted the Middle District such that jurors in this district would have a localized interest in resolving this dispute. "Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Gilbert*, 330 U.S. at 508–09. As the conduct giving rise to suit—outside of the passage of the law—occurred in St. Martin Parish, "the local interest in having localized interests decided at home" weighs heavily in favor of transfer to the Western District of Louisiana. *Volkswagen I*, 371 F.3d at 206 (citation and internal quotation marks omitted).

### iii.  Governing Law

As both the Western District and Middle District sit within the state of Louisiana and regularly apply Louisiana law in the adjudication of their cases, both districts are equally familiar with the state law at issue in this case.  And both forums are certainly on equal footing with respect to the federal law governing Plaintiffs' suit.  Accordingly, this factor is neutral.

### iv.  Conflict of Laws

Based on Plaintiffs' theories of liability, there are no conflict-of-laws issues, and this case will not require the application of foreign law.  Thus, this factor is also neutral.

### C.  *Summary*

This lawsuit arises out of environmental justice advocacy and arrests pursuant to Louisiana Revised Statute 14:61 which occurred primarily in St. Martin Parish; the lawsuit includes allegations of misconduct that took place almost exclusively in the Western District. Pursuit of the case will require production of documents and witnesses that are located primarily in the Western District. Allegations are asserted against a District Attorney and Sheriff whose offices are in the Western District.  Accordingly, it is both more convenient for the parties and witnesses and in the interest of justice that this case be transferred to the Western District of Louisiana.

### CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Attorney General Jeff Landry's Motion to Dismiss* filed by Attorney General Jeff Landry, in his official capacity (Doc. 30); the *Sheriff's Motion to Dismiss* filed by Sheriff Ronald Theriot (Doc. 31) and *Motion to Dismiss; Alternatively to Transfer to the United States District Court tor the Western District of Louisiana Filed on behalf of M. Bofill Duhé in his Official Capacity as District Attorney for the 16th Judicial District, State of Louisiana*

filed by District Attorney M. Bofill Duhé (Doc. 32) are **GRANTED** in part and **DENIED** in part as follows;

**IT IS FURTHER ORDERED** that the claims against Attorney General Jeff Landry are **DISMISSED**;

**IT IS FURTHER ORDERED** that the Court **GRANTS** the alternative motion to transfer venue under 28 U.S.C. § 1404(a) and this matter is transferred to the United States District Court for the Western District of Louisiana;

**IT IS FURTHER ORDERED** that the *Attorney General Jeff Landry's Motion to Dismiss* filed by Attorney General Jeff Landry, in his official capacity (Doc. 30); the *Sheriff's Motion to Dismiss* filed by Sheriff Ronald Theriot (Doc. 31) and *Motion to Dismiss; Alternatively to Transfer to the United States District Court tor the Western District of Louisiana Filed on behalf of M. Bofill Duhé in his Official Capacity as District Attorney for the 16th Judicial District, State of Louisiana* filed by District Attorney M. Bofill Duhé (Doc. 32) are otherwise **DENIED**.

Signed in Baton Rouge, Louisiana, on July 30, 2020.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**